UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
NATIONAL RAILROAD PASSENGER
CORPORATION,

                                 Plaintiff,

          -against-

JOAN McDONALD, COMMISSIONER,
The New York State Department of
Transportation,

                              Defendant.
--------------------------------------------------------x

Electronically Filed

12 Civ. 2731 (CM)(GWG)

## DEFENDANT'S MOTION TO DISMISS
## AND/OR FOR SUMMARY JUDGMENT

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
*Attorney for Defendants*
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-8426
william.taylor@ag.ny.gov

WILLIAM J. TAYLOR, JR.
Assistant Attorney General
    *Of Counsel*

Reproduced on Recycled Paper

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 3

A.   The Parties............................................................................................................ 3

B.   The Bronx River Greenway Project .................................................................... 4

C.   The Amtrak Parcels At Issue in This Action........................................................ 5

    Parcel 105................................................................................................................ 6
    Parcels 107, 108, and 109 ....................................................................................... 6
    Parcels 110 and 111 ................................................................................................ 7
    Parcel 178................................................................................................................ 8

D.   The Eminent Domain Proceedings ...................................................................... 9

    1.   The May 2005 EDPL Public Hearing ........................................................... 9

    2.   DOT's August 2005 Determination and Findings ........................................ 10

    3.   The Commissioner's February 2008 Acquisitions
       of Parcels 105, 107, 108, 109, 110, and 111 ................................................ 11

    4.   DOT's October 2009 Notification Regarding Parcel 178............................. 13

E.   Amtrak's Offer to Sell Parcels 105, 107, 108, 109, 110, and 111 to DOT .......... 13

F.   The Present Action .............................................................................................. 14

ARGUMENT ............................................................................................................. 14

   I.   THE BULK OF AMTRAK'S CLAIMS ARE BARRED BY THE ELEVENTH
      AMENDMENT.................................................................................................. 14

   II.   AMTRAK'S CLAIMS ARE PRECLUDED ON WAIVER,
      STATUTE OF LIMITATIONS, AND ABSTENTION GROUNDS............................... 17

      A.   The *Didden* Case ....................................................................................... 18

      B.   All of Amtrak's Claims Are Barred on Waiver Grounds............................ 19

C.    All of Amtrak's Claims Are Barred on Statute of Limitations Grounds .................. 22

D.    Amtrak's Claims with Respect to Parcel 178 Should Be Dismissed
       under the *Younger* Abstention Doctrine .................................................. 24

III.   AMTRAK'S PREEMPTION CLAIMS ALSO
       FAIL, AS A MATTER OF LAW, ON THE MERITS .................................................... 28

A.    The Law of Federal Preemption................................................................ 28

B.    Amtrak's Claims for Express Preemption Are Without Merit................................ 31

    1.   No Express Preemption Under 49 U.S.C. § 24301(g) ......................................... 31

    2.   No Express Preemption Under 49 U.S.C. § 24902(j)......................................... 35

C.    Amtrak's Implied Preemption Claims Under the RPSA and the
       Rail Act Also Fail As a Matter of Law ...................................................... 38

D.    Amtrak Has No Viable Claim for Preemption Based on the Federal
       Government's Mortgage Interest in Its Property -- and the Mortgage
       Documents, In Fact, Strongly Support the Commissioner's Exercise
       of Eminent Domain Here ..................................................................... 43

E.    The Out-of-Circuit Cases Relied on by Amtrak Do Not Support Its Claims............. 47

CONCLUSION.................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*23-34 94th St. Grocery Corp.* v. *N.Y.C. Bd. of Health*,
685 F.3d 174 (2d Cir. 2012).............................................................29, 30

*Abundance Partners LP* v. *Quamtel, Inc.*,
840 F. Supp. 2d 758 (S.D.N.Y. 2012) (McMahon, J.)................................32

*Arizona* v. *United States*,
132 S. Ct. 2492 (2012).............................................................28, 29, 30

*Blanchette* v. *New York*,
412 F. Supp. 219 (S.D.N.Y. 1976)..................................................16

*Buffalo S. R.R.* v. *Village of Croton-on-Hudson*,
434 F. Supp. 2d 241 (S.D.N.Y. 2006) (McMahon, J.)......................2, 21, 31, 42, 47

*Chamber of Commerce of U.S.* v. *Whiting*,
131 S. Ct. 1968 (2011) (plurality opinion) ................................3, 38, 49

*Chen* v. *City Univ. of N.Y.*,
No. 11 Civ. 0320(CM), 2011 WL 5419792 (S.D.N.Y. Nov. 9, 2011) ...................15

*City of New York* v. *Nat'l R.R. Passenger Corp.*,
373 F. App'x 84 (2d Cir. 2010)  ................................33-34, 36- 37

*City of New York* v. *Nat'l R.R. Passenger Corp.*,
No. 06-CV-793, 2009 WL 483343 (E.D.N.Y. Feb. 29, 2009) ..............33-34, 36-37

*City of New York* v. *Nat'l R.R. Passenger Corp.*,
No. 06-CV-793, 2008 WL 5169636 (E.D.N.Y. Dec. 8, 2008)..............33-34, 36-37

*City of Philadelphia* v. *Baker*,
508 F.2d 279 (3d Cir. 1975)..................................................39

*Dean* v. *Abrams*,
No. 94 Civ. 3704 (LAK), 1995 WL 791966 (S.D.N.Y. Dec. 26, 1995)..................16

*Diamond "D" Constr. Corp.* v. *McGowan*,
282 F.3d 191 (2d Cir. 2002)..................................................27

*Didden* v. *Village of Port Chester*,
173 F. App'x 931 (2d Cir. 2006) ....................................................2, 17-19, 22-23

*Didden* v. *Village of Port Chester*,
304 F. Supp. 2d 548, *and* 322 F. Supp. 2d 385 (S.D.N.Y. 2004) (McMahon, J.), *aff'd*
173 F. App'x 931 (2d Cir. 2006) ............................................. 2, 17-19, 21-23, 25-27

*Donahue* v. *Mangano*,
--- F. Supp. 2d ----, 2012 WL 3561796 (E.D.N.Y. Aug. 20, 2012) ........................................24

*Ex parte Young*,
209 U.S. 123 (1908.) ...........................................................................14

*Export-Import Bank of U.S.* v. *Asia Pulp & Paper Co.*,
609 F.3d 111 (2d Cir. 2010) ...................................................................30, 48

*Farina* v. *Nokia Inc.*,
625 F.3d 97 (3d Cir. 2010) ........................................................................46

*Goldstein* v. *N.Y. State Urban Dev. Corp.*,
13 N.Y.3d 511 (2009) .............................................................................23

*Goldstein* v. *Pataki*, No. 06 CV 5827(NGG) (RML), 2007 WL 1695573 (E.D.N.Y. Feb.
23, 2007) *adopted in part and rejected in part by* 488 F. Supp. 2d 254 (E.D.N.Y.
2007), *aff'd*, 516 F.3d 50 (2d Cir. 2008) ..................................................26, 27

*Haynes* v. *Nat'l R.R. Passenger Corp.*,
423 F. Supp. 2d 1073 (C.D. Cal. 2006) .....................................................35, 40

*Hollander* v. *Brezenoff*,
787 F.2d 834 (2d Cir. 1986) .....................................................................23

*Ill. Clean Energy Cmty. Found.* v. *Filan*,
392 F.3d 934 (7th Cir. 2002) (Posner, J.) ......................................................3

*In re Litig. Under Reg'l Rail Reorganization Act of 1973*,
373 F. Supp. 1401 (J.P.M.L. 1974) ..............................................................39

*In re Methyl Tertiary Butyl Ether Prods. Lia. Litig.*,
739 F. Supp. 2d 576 (S.D.N.Y. 2010) ...........................................................38

*In re N.Y. State Urban Dev. Corp.*,
26 Misc. 3d 1228(A), 2010 WL 702319 (Sup. Ct. Kings Cnty. Mar. 1, 2010) ......................20

*In re WTC Disaster Site*,
414 F.3d 352 (2d Cir. 2005) .....................................................................30

*Jones* v. *Newman*,
   No. 98 Civ. 7460(MBM), 1999 WL 493429 (S.D.N.Y. June 30, 1999) ..............................16

*Knight* v. *New York*,
   443 F.2d 415 (2d Cir. 1971)......................................................................... 1, 15-17, 48

*Madeira* v. *Affordable Hous. Found.*,
   469 F.3d 219 (2d Cir. 2006)...............................................................................38

*Marsh* v. *Rosenbloom*,
   499 F.3d 165 ................................................................................................38

*Matter of Waldo's, Inc.* v. *Vill. of Johnson City*,
   74 N.Y.2d 718 (1989) ....................................................................................21

*Muto* v. *CBS Corp.*,
   668 F.3d 53 (2d Cir. 2012)................................................................................23

*N.Y. State Conf. of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*,
   514 U.S. 645 (1995)........................................................................................35

*N.Y. State Rest. Ass'n* v. *N.Y.C. Bd. of Health*,
   556 F.3d 114 (2d Cir. 2009)...............................................................................30

*Nat'l R.R. Passenger Corp.* v. *Colonial Pipeline Co.*,
   No. Civ. JFM-05-2267, 2006 WL 236788 (D. Md. Jan. 31, 2006) ......................41, 46, 47, 48

*Nat'l R.R. Passenger Corp.* v. *Pa. Pub. Util. Comm'n*,
   No. CIV. A. 86-5357, 1997 WL 597963 (E.D. Pa. Sept. 15, 1997) .......................................17

*Niagara Mohawk Power Corp.* v. *Hudson River-Black River Regulating Dist.*,
   673 F.3d 84 (2d Cir. 2012)................................................................................29

*Parent* v. *New York*,
   No. 11-2474-cv, 2012 WL 2213658 (2d Cir. June 18, 2012)................................................24

*Sabre* v. *First Dominion Capital, LLC*,
   No. 01 Civ. 2145(BSJ)(HBP), 2001 WL 1590544 (S.D.N.Y. Dec. 12, 2001) ......................32

*Skidmore* v. *Swift & Co.*,
   323 U.S. 134 (1944).......................................................................................46

*Spargo* v. *N.Y. State Comm'n on Jud. Conduct*,
   351 F.3d 65 (2d Cir. 2003)................................................................................24

*Sun Co.* v. *City of Syracuse Indus. Dev. Agency*,
   209 A.D.2d 34 (4th Dep't 1995) .......................................................................21

*U.S. Smokeless Tobacco Mfg. Co.* v. *City of New York*,
   703 F. Supp. 2d 329 (S.D.N.Y. 2010) (McMahon, J.)............................................28-30, 37-38

*UGI Utils.* v. *Nat'l R.R. Passenger Corp.*,
   No. 1:CV-02-1230, 2004 WL 3928263 (M.D. Pa. July 2, 2004) ...............................41, 47, 48

*United Ctr. Dev. Corp.* v. *Nat'l R.R. Passenger Corp.*,
   103 F.3d 62 (8th Cir. 1997) ...................................................................................41, 46, 47

*United States ex rel. Sasaki* v. *N.Y. Univ. Med. Ctr.*,
   No. 05 Civ. 6163 (LMM)(HBP), 2012 WL 220219 (S.D.N.Y. Jan. 25, 2012) ......................32

*United States* v. *Plasser Am. Corp.*,
   57 F. Supp. 2d 140 (E.D. Pa. 1999) .....................................................................................17

*Va. Office for Prot. & Advocacy* v. *Stewart*,
   131 S. Ct. 1632 (2011)..............................................................................................15, 17

*Vitucci* v. *N.Y.C. Sch. Constr. Auth.*,
   289 A.D.2d 479 (2d Dep't 2001) .........................................................................................40

*W. 41st St. Realty LLC* v. *New York State Urban Dev. Corp.*,
   298 A.D.2d 1 (1st Dep't 2002) .......................................................................................28, 48

*Ward* v. *Thomas*,
   207 F.3d 114 (2d Cir. 2000)..................................................................................................17

*Wyeth* v. *Levine*,
   555 U.S. 555 (2009)..............................................................................................31, 38, 46, 48

## CONSTITUTION AND STATUTES

U.S. Const. art. VI, cl. 2............................................................................................................29

Regional Rail Reorganization Act of 1973, 45 U.S.C.
   §§ 701 *et seq.* (the "Rail Act")................................................................................... *passim*

Rail Passenger Service Act of 1970, 49 U.S.C.
   §§ 24101 *et seq.* (the "RPSA") ................................................................................. *passim*

49 U.S.C. § 24902(j) ...................................................................2, 28, 31, 35, 36, 37, 47

New York Eminent Domain Procedure Law (the "EDPL")
    §§ 201-203 .................................................................................................9, 18
    § 202.............................................................................................................18
    § 202(D).......................................................................................................20
    § 204............................................................................................10, 18, 20
    § 207 ............................................................................................... *passim*
    § 207(A)........................................................................................................23
    § 207(C)(3)...................................................................................................20
    § 208......................................................................................................11, 25
    § 304......................................................................................................12, 42
    § 401......................................................................................................11, 25
    § 401(A)........................................................................................................11
    § 401(C) .................................................................................................13, 25
    § 402(A) ..........................................................................................12, 16, 48
    § 401(C) .................................................................................................13, 25
    § 503............................................................................................................26

New York State Highway Law
    § 22.........................................................................................................4, 16
    § 30..................................................................................................... 4, 15-16

## MISCELLANEOUS

Brief for Defendant-Appellant, *City of New York* v. *Nat'l R.R. Passenger Corp.*,
    373 F. App'x 84 (2d Cir. 2010) (No. 09-1200), *available at* 2009 WL 7856700 .............34, 36

Appellee's Brief, *City of New York* v. *Nat'l R.R. Passenger Corp.*,
    373 F. App'x 84 (2d Cir. 2010) (No. 09-1200), *available at* 2009 WL 7856701 ............. 36-37

Reply Brief for Defendant-Appellant, *City of New York* v. *Nat'l R.R. Passenger Corp.*,
    373 F. App'x 84 (2d Cir. 2010) (No. 09-1200), *available at* 2009 WL 7856702 ............. 36-37

Defendant National Railroad Passenger Corporation's Memorandum of Law in Support
    of Its Motion for Partial Summary Judgment, v. *Nat'l R.R. Passenger Corp.*,
    No. 06-CV-793, 2008 WL 5169636 (E.D.N.Y. Dec. 8, 2008), *available at* 2007 WL
    4914428..................................................................................................................34

Defendant's Memorandum of Law in Opposition to Plaintiff's Request for Prejudgment
    Interest, *City of New York* v. *Nat'l R.R. Passenger Corp.*,
    No. 06-CV-793, 2009 WL 483343 (E.D.N.Y. Feb. 29, 2009), *available at* 2009 WL
    1933938..............................................................................................................34, 36

Defendant Commissioner Joan McDonald of the New York State Department of Transportation (the "Commissioner") respectfully submits this memorandum of law in support of her motion, brought pursuant to Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure, to dismiss the First Amended Complaint filed by plaintiff National Railroad Passenger Corporation ("Amtrak") in this action with prejudice, or, alternatively, for summary judgment against Amtrak.

## PRELIMINARY STATEMENT

Apparently based on the mistaken belief "that there is no parcel of Amtrak property anywhere in the United States that a state could ever take by eminent domain," (Amtrak Dep. at 268:14-18), Amtrak brings this action for declaratory and injunctive relief, seeking to undo and nullify the Commissioner's wholly proper, and entirely lawful, takings of its property.  None of Amtrak's claims has any basis.  And the dismissal of each is appropriate here for several reasons.

*First*, the bulk of Amtrak's claims are barred on Eleventh Amendment grounds.  As the Second Circuit held over forty years ago, when, as indisputably happened in this case, the Commissioner, in the process of taking property by eminent domain, "fil[es] . . . a description and map of the property to be appropriated in the office of the county clerk or register of the county in which the property is situated," title to the property is "vest[ed] in the State immediately upon th[at] filing."  *Knight* v. *New York*, 443 F.2d 415, 416 (2d Cir. 1971).  And any effort to defeat the State's title by bringing an action against the Commissioner, as Amtrak attempts here, is a claim for retrospective relief seeking to remedy an alleged past violation of federal law -- and is thus precluded under the Eleventh Amendment.  *Id.* at 416, 419-22.

As discussed below, it is clear that with respect to six of the seven parcels of property at issue in this case, the Commissioner filed the requisite "description and map of the property to be

appropriated" in February 2008.  Thus, under settled authority, title to these six parcels vested in

the State at that time.  And, under *Knight*, Amtrak's effort now to challenge these takings

through its suit for declaratory and injunctive relief against the Commissioner is plainly barred

by the Eleventh Amendment.  *See infra* pp.14-17.

     ***Second***, Amtrak's claims are also precluded on waiver, statute of limitations, and

abstention grounds.  This Court's and the Second Circuit's decisions in *Didden* v. *Village of Port

Chester*, 304 F. Supp. 2d 548, *and* 322 F. Supp. 2d 385 (S.D.N.Y. 2004) (McMahon, J.), *aff'd*

173 F. App'x 931 (2d Cir. 2006), are controlling here.

     As discussed below, under *Didden*, and the plain terms of New York's Eminent Domain

Procedure Law (the "EDPL"), Amtrak's time to bring a judicial challenge to the Commissioner's

decision to take its property expired over six and a half years ago.  Amtrak's attempt to raise this

challenge now thus unquestionably fails, as to all of its claims, on the basis of both waiver and

the statute of limitations.  In addition, because, under *Didden*, the EDPL proceedings with

respect to the one parcel of property in dispute to which the State has not yet acquired title

remain ongoing, Amtrak's claims as to this parcel are also subject to dismissal under the *Younger*

abstention doctrine.  *See infra* pp.17-27.

     ***Third***, each of Amtrak's claims in this action -- for express preemption under the Rail

Passenger Service Act of 1970, 49 U.S.C. §§ 24101 *et seq.* (the "RPSA"), and 49 U.S.C.

24902(j), and for implied preemption under the Regional Rail Reorganization Act of 1973, 45

U.S.C. §§ 701 *et seq.* (the "Rail Act"), the RPSA, and pursuant to the federal government's

mortgage interest in Amtrak's property -- also fails on the merits as a matter of law.  Despite

what Amtrak contends, under a proper preemption analysis -- and pursuant to the "fact-specific

inquiry" required here, *Buffalo S. R.R.* v. *Village of Croton-on-Hudson*, 434 F. Supp. 2d 241, 249

(S.D.N.Y. 2006) (McMahon, J.) -- it is evident that nothing in the federal statutes relied on by Amtrak or in the federal government's mortgage on Amtrak's property preempts the Commissioner's power to take the seven parcels at issue by eminent domain.

Simply put, to prevail on its preemption claims, Amtrak must meet a "high threshold." *Chamber of Commerce of U.S.* v. *Whiting*, 131 S. Ct. 1968, 1985 (2011) (plurality opinion).  It does not come close to doing so.  Summary judgment dismissing each of Amtrak's claims is thus fully warranted.  *See infra* pp. 28-49.

Accordingly, for all these reasons, discussed in detail below, the Commissioner's motion should be granted, and Amtrak's claims should be dismissed in their entirety.

## STATEMENT OF FACTS

The relevant facts, which are undisputed on this motion, are contained in the First Amended Complaint, the July 19, 2012 Rule 30(b)(6) deposition of Amtrak, and the accompanying declarations of Roger K. Weld and William J. Taylor, Jr., including the exhibits thereto.

### A.    The Parties

Plaintiff Amtrak is a private, for-profit District of Columbia corporation created by the RPSA.  (First Amended Complaint ("FAC") ¶ 7); 49 U.S.C. § 24301; *see Ill. Clean Energy Cmty. Found.* v. *Filan*, 392 F.3d 934, 938 (7th Cir. 2002) (Posner, J.) (noting that Amtrak is a private, for-profit corporation, and that Amtrak property is private property "for takings purposes").  It operates intercity and commuter rail service throughout the United States, including in Bronx County, New York.  (FAC ¶ 7.)  Amtrak "is not a department, agency, or instrumentality of the United States government."  49 U.S.C. § 24301(a)(3).

Defendant Commissioner Joan McDonald is the Commissioner of the New York State

Department of Transportation ("DOT").  Pursuant to sections 22 and 30 of the New York State

Highway Law (the "Highway Law") and the EDPL, the Commissioner, including her authorized

agents and delegees at DOT, has full power to acquire property by eminent domain on behalf of

the State of New York "for state highway purposes."  Highway Law § 22 (noting that the

acquisition of property "in order to provide multi-use areas adjacent to state highways and

recreational, natural and scenic areas along, but not necessarily contiguous to, state highways" or

"for the purpose of constructing bikeways" anywhere in the state "shall constitute a state

highway purpose"); *id.* § 30.  The Commissioner is being sued here in her official capacity.

(FAC ¶ 9.)

> **B.**    **The Bronx River Greenway Project**

The Bronx River Greenway (the "Greenway") -- the acquisition of property for which is

at issue in this case -- is a joint federal, New York State, and New York City redevelopment

project that, when complete, will consist of a 23-mile-long ribbon of parkland (8 miles of which

are in New York City) with a multi-use path that will extend along the entire length of the Bronx

River, from its mouth at the East River to its source in Westchester County.  (Weld Decl. ¶ 3; Ex.

3 at AMT-BR-GY 210; Ex. 4; FAC ¶ 13.)[1]

Approximately 15 miles of the Greenway are now in place, and more than $150 million

in resources have been devoted thus far to the project, which has already resulted in the cleanup

of the Bronx River, the restoration of much of its waterfront, the renovation of several existing

parks, and the building of considerable new parkland, bike paths, running and walking trails, and

---

[1] References to "Ex. __" refer to exhibits annexed to the accompanying Declaration of William J. Taylor, Jr.  References to "Weld Decl." and "Weld Decl. Ex. __" refer to the accompanying Declaration of Roger K. Weld and the exhibits annexed thereto.  References to "Amtrak Dep." refer to the deposit transcript of Amtrak's Rule 30(b)(6) witness Earl Watson, excerpts from which are included as Exhibit 45 to the Taylor Declaration.

canoeing facilities in the Bronx.  (Weld Decl. ¶ 3; Exs.3-4; FAC ¶ 13.)  Moreover, and as a central part of its mission, the Greenway, when complete, will have developed significant new open green space in economically disadvantaged neighborhoods long deprived of it, including some of the poorest neighborhoods in the nation, in the South Bronx.  (Weld Decl. ¶ 4; Ex. 3 at AMT-BR-GY 205; Ex. 4; FAC ¶ 14.)

DOT has played, and continues to play, an important role in the development of the Greenway.  (Weld Decl. ¶ 5; Ex. 3 at AMT-BR-GY 215-220; FAC ¶¶ 13-14.)  In particular, DOT is implementing the portion of the Greenway stretching from Westchester Avenue to West Farms Square, near East Tremont Avenue in the Bronx.  (Weld Decl. ¶ 5; Ex. 3 at AMT-BR-GY 215-220.)  To date, DOT's efforts on the Greenway have included the reconstruction of Starlight Park, located along the banks of the Bronx River between E.172nd Street and E. 174th Street, with new soccer and softball fields, playgrounds, picnic areas, and a floating dock; the development of new green space, bike paths, and running and walking trails; and the construction of a new pedestrian bridge across the Bronx River north of E. 174th Street.  (Weld Decl. ¶ 6; Ex. 3 at AMT-BR-GY 215-220; Ex. 4; Weld Decl. Ex. A.)

DOT also has significant plans for the development of the Greenway between Westchester Avenue and E. 172nd Street in the Bronx -- where the parcels of property at issue in this case are located.  (Weld Decl. ¶ 7; Weld Decl. Ex. A.)  These plans include both the development of new parkland and the construction of three additional pedestrian bridges necessary to link up the existing portions of the Greenway.  (Weld Decl. ¶ 7; Weld Decl. Ex. A.)

C.    **The Amtrak Parcels At Issue in This Action**

To develop DOT's portion of the Greenway, the Commissioner has exercised her powers of eminent domain with respect to several parcels of property in the South Bronx, the acquisition

of each of which, she has determined, is necessary for the Greenway's completion. (Weld Decl. ¶ 8.) This property includes the seven parcels at issue in this case -- six of which the Commissioner, on behalf of the State of New York, has already acquired title to (Parcels 105, 107, 108, 109, 110, and 111), and one (Parcel 178) as to which the Commissioner has begun, but not yet completed, the acquisition process. (*Id.*; Exs. 1a-1d; Exs. 2a-2d; Exs. 5-9.)

More specifically:

**Parcel 105.** Parcel 105 is a 5,141.5 square-foot parcel of land, located just north of Westchester Avenue in the Bronx, on the west side of Bronx River, and on the east side of Amtrak's tracks. (Amtrak Dep. at 105:8-107:10; Weld Decl. ¶ 9(a); Exs. 1a, 2a, 5, 9.) It is a portion of what is referred to as Block 3017, Lot 6. (Weld Decl. ¶ 9(a); Amtrak Dep. at 106:3-8; Exs. 1a, 2a, 5.) As detailed below, Parcel 105 was acquired by the Commissioner in February 2008, through her powers of eminent domain, in order to further develop the Greenway and to construct a needed pedestrian bridge over the Bronx River. (Weld Decl. ¶ 9(a); Exs. 1a, 2a, 5.) Prior to its acquisition by the State, Parcel 105 had, for many years, been fenced in by the adjacent property owner as a part of its land, and used by that adjacent property owner as a part of its business -- *i.e.*, "as part of an impound lot to store vehicles that had been seized by federal marshals." (Amtrak Dep. at 116:12-24; Weld Decl. ¶ 9(a); Ex. 3 at AMT-BR-GY 218.) Parcel 105 has not been physically used by Amtrak for any purpose since at least 2000, and Amtrak has not identified any specific future plans for projects on or around this parcel. (Weld Decl. ¶ 9(a); Amtrak Dep. at 112:12-113:11, 116:25-118:9, 187:9-191:10, 191:19-196:19, 198:23-200:20, 202:3-11, 206:16-211:14; Exs. 10-12.)

**Parcels 107, 108, and 109.** Parcels 107, 108, and 109 are three permanent easements that, as detailed further below, DOT acquired in February 2008 in order to construct and

maintain a new retaining wall alongside Amtrak's tracks, as necessary for completion of the Bronx River Greenway. (Weld Decl. ¶ 9(b); Amtrak Dep. at 125:8-126:18; Exs. 1b, 2b, 6.) Each is a portion of Block 3769, Lot 12, and is located north of Parcel 105. (Weld Decl. ¶ 9(b); Amtrak Dep. at 126:19-127:24; Exs. 1b, 2b, 6, 9.) Parcel 107 is a 1,702.5 square-foot easement, on the east side of Amtrak's tracks, just over the Bronx River from Parcel 105. (Weld Decl. ¶ 9(b); Amtrak Dep. at 128:4-25; Exs. 1b, 2b, 6, 9.) Parcel 108 is a 2,140.8 square-foot easement, also on the east side of Amtrak's tracks, starting near E. 172nd Street and going south toward Parcel 107. (Weld Decl. ¶ 9(b); Amtrak Dep. at 130:4-131:7; Exs. 1b, 2b, 6, 9.) Parcel 109 is a 1,029.8 square-foot easement, located on the west side of Amtrak's tracks, and, like Parcel 108, also starting near E. 172nd Street and going south. (Weld Decl. ¶ 9(b); Amtrak Dep. at 131:8-21; Exs. 1b, 2b, 6, 9.) Parcels 107, 108, and 109 are where the existing retaining wall along Amtrak's tracks is located, and has been since before the State's acquisition of these three parcels. (Weld Decl. ¶ 9(b); Amtrak Dep. at 135:7-136:11.) Aside from maintaining this retaining wall, Amtrak has identified no specific future plans for projects on or around these three parcels. (Weld Decl. ¶ 9(b); Amtrak Dep. at 136:12-22, 187:9-191:10, 191:19-196:19, 198:23-200:20, 202:3-11, 206:16-211:14; Exs. 10-12.)

**Parcels 110 and 111.** Like Parcels 107, 108, and 109, Parcels 110 and 111 are also permanent easements that DOT acquired in February 2008 in order to construct and maintain a new retaining wall alongside Amtrak's tracks, as required for completion of the Greenway. (Weld Decl. ¶ 9(c); Amtrak Dep. at 148:21-149:3; Exs. 1c, 2c, 7.) Each is a portion of Block 3861, Lot 8 in the Bronx. (Weld Decl. ¶ 9(c); Exs. 1c, 2c, 7.) Parcel 110 is a very small, 34.38 square-foot easement, on the east side of Amtrak's tracks, just north of E. 172nd Street. (Weld Decl. ¶ 9(c); Amtrak Dep. at 145:20-146:3; Exs. 1c, 2c, 7.) Parcel 111 is a 433.78 square-foot

easement, located on the west side of Amtrak's tracks, starting just north of E. 172nd Street and then continuing north toward E. 173rd Street.  (Weld Decl. ¶ 9(c); Amtrak Dep. at 146:18-148:15; Exs. 1c, 2c, 7, 9.)  Like Parcels 107, 108, and 109, Parcels 110 and 111 are where the existing retaining wall along Amtrak's tracks is located, and where that wall has been located since before the State acquired these two parcels.  (Weld Decl. ¶ 9(c); Amtrak Dep. at 149:4-18.)  Aside from maintaining this retaining wall, Amtrak has identified no specific future plans for projects on or around these two parcels.  (Weld Decl. ¶ 9(c); Amtrak Dep. at 149:4-18, 187:9-191:10, 191:19-196:19, 198:23-200:20, 202:3-11, 206:16-211:14; Exs. 10-12.)

**Parcel 178.**  Parcel 178 is a 6,395.92 square-foot aerial easement to construct and maintain a bridge over Amtrak's tracks at E. 172nd Street, which is needed to complete the Greenway -- and, in particular, to supply access for South Bronx residents and others to the newly-reconstructed Starlight Park.  (Weld Decl. ¶ 9(d); Amtrak Dep. at 169:2-170:21; Exs. 1d, 2d, 8, 9.)  Parcel 178 is a portion of both Block 3769, Lot 12 (where Parcels 107, 108, and 109 are also located) and Block 3861, Lot 8 (where Parcels 110 and 111 are located).  (Weld Decl. ¶ 9(d); Amtrak Dep. at 170:2-7; Exs. 1d, 2d, 8, 9.)  A bridge over Amtrak's tracks existed at this location for many years, while Amtrak's trains ran underneath it.  (Weld Decl. ¶ 9(d) n.1; Amtrak Dep. at 179:12-21.)  That bridge was knocked down more than a decade ago, but its abutments were kept.  (Weld Decl. ¶ 9(d) n.1; Amtrak Dep. at 179:19-20; Exs. 14-15.)  And, while Amtrak apparently disputes this, the City of New York, which maintained the prior bridge, has asserted that it retains the right to rebuild a new bridge at this very spot.  (Weld Decl. ¶ 9(d) n.1; Amtrak Dep. at 97:3-19; Exs. 13-15.)  As discussed below, the Commissioner began eminent domain proceedings with respect to Parcel 178 -- along with the other six parcels at issue -- in 2005, but she has yet to finalize these proceedings and complete the acquisition of

8

Parcel 178.  (Weld Decl. ¶ 9(d).)

### D.    The Eminent Domain Proceedings

As noted, the Commissioner began eminent domain proceedings with respect to each of the seven parcels at issue in this case, along with the property the acquisition of which DOT determined was necessary for the Bronx River Greenway, in 2005.  For Parcels 105, 107, 108, 109, 110, and 111, these proceedings concluded in 2008, when the Commissioner, on behalf of the State, acquired title to the property.  For Parcel 178, these proceedings remain ongoing.

### 1.    The May 2005 EDPL Public Hearing

Pursuant to Article 2 of the EDPL, the Commissioner commenced eminent domain proceedings here in 2005, by noticing and holding a public hearing regarding the development of the Bronx River Greenway between Westchester Avenue and East Tremont Avenue, and DOT's intention to acquire by condemnation the necessary property for this development by eminent domain.  (Weld Decl. ¶ 13); *see* EDPL §§ 201-203.  Specifically, in April and May 2005, notice of the public hearing was published in several area newspapers, including, from April 19, 2005 to April 23, 2005, in the New York *Daily News*.  (Weld Decl. ¶ 14; Exs. 16-19.)  Notice was also sent to, among others, "all the home owners who[se] property is being impacted by the Project as well as the two businesses being relocated."  (Weld Decl. ¶ 14; Ex. 16.)  In addition, DOT's records reflect that specific notice of the public hearing was mailed to Amtrak by May 9, 2005, and that Roger Weld, a DOT Professional Engineer who had been involved for many years in communicating with Earl Watson of Amtrak (who was then an Amtrak Project Development Officer, is now Amtrak's Director of I&C Projects, and was Amtrak's 30(b)(6) witness in this case) and other Amtrak representatives regarding DOT's plans for the Greenway, left a phone message regarding the public hearing for Mr. Watson during the week of May 2, 2005.  (Weld

Decl. ¶¶ 14-15; Exs. 20-22.)[2]

And it is undisputed that, by May 11, 2005, when Mr. Weld sent an e-mail to Mr. Watson so informing him, Amtrak was on notice both of the public hearing and that DOT intended to acquire the parcels in dispute here by eminent domain. (Weld Decl. ¶¶ 15-17; Ex. 22; Amtrak Dep. at 216:21-223:20, 224:5-17.) By the very next day, May 12, 2005, numerous officials at Amtrak other than Mr. Watson -- including Amtrak's in-house counsel and other "appropriate people who were in authority to address the issue" -- were specifically made aware of the public hearing and DOT's plans to acquire Amtrak property by eminent domain as well. (Weld Decl. ¶ 17; Ex. 22; Amtrak Dep. at 226:8-227:8, 229:24-232:8, 239:2-240:18.)

In accordance with the notice provided, DOT held the EDPL public hearing on May 19, 2005, at a public school building in the Bronx. (Weld Decl. ¶ 18; Ex. 23.) No one from Amtrak participated in the hearing, nor do DOT's records indicate that anyone from Amtrak even attended the hearing. (Weld Decl. ¶ 18; Ex. 23; Amtrak Dep. at 240:19-242:22.) Amtrak also did not avail itself of the opportunity to make written submissions in connection with the public hearing, which were accepted until May 29, 2005. (Weld Decl. ¶ 19; *see* Ex. 23 at 7; Amtrak Dep. at 240:19-242:22.)

### 2.    DOT's August 2005 Determination and Findings

Following the public hearing, DOT, on August 17, 2005, issued its "Determination and Findings" with respect to the Greenway project and its acquisitions of the property at issue here. (Weld Decl. ¶ 20; Exs. 24-25.) Pursuant to section 204 of the EDPL, the DOT's Determination

---

[2] DOT's records reflect that the mail notice was addressed and sent to Amtrak offices at R Street in Washington, DC. (Exs. 20-21.) We have been unable to confirm, nor was Amtrak's 30(b)(6) witness, whether this was an address for Amtrak in 2005 and/or whether anyone at Amtrak received this mail notice. (Amtrak Dep. at 317:17-318:22.) As discussed below, these uncertainties have no impact here in any event.

and Findings set forth, among other things, the public use, benefit, and purpose of the project, the approximate location of the project in the Bronx, and the reasons for the DOT's selection of that location.  (Weld Decl. ¶ 20; Exs. 24-25.)  A synopsis of the Determination and Findings -- which specifically pointed "property owners who may wish to challenge condemnation of the property via judicial review" to the applicable judicial review provisions in sections 207 and 208 of the EDPL -- was published in the New York *Daily News* on August 19, 2005, and DOT's records reflect that this synopsis was subsequently mailed to affected property owners, including Amtrak, as well.  (Weld Decl. ¶ 21; Exs. 24-26.)  Moreover, Amtrak's 30(b)(6) witness in this case acknowledged that Amtrak was aware of DOT's issuance of this Determination and Findings.  (Amtrak Dep. at 247:8-25, 249:9-14; Weld Decl. ¶ 22.)

Nonetheless, Amtrak never brought any kind of legal proceeding challenging any of DOT's steps to acquire the parcels, or any one of them, by eminent domain until Amtrak commenced this lawsuit over *six and half years* later, on April 9, 2012.  (Weld Decl. ¶ 23; Complaint at 1.)

### 3. The Commissioner's February 2008 Acquisitions of Parcels 105, 107, 108, 109, 110, and 111

Under section 401 of the EDPL, the Commissioner had three years from the date of DOT's publication of the Determination and Findings -- so, until August of 2008 -- to "commence proceedings under [Article 4 of the EDPL] to acquire the property" at issue.  EDPL § 401(A).  This deadline was indisputably met here.

After some communications between DOT and Amtrak officials in the intervening time regarding the property acquisition process -- including Amtrak's assertion on May 15, 2006, that "the State of New York does not have condemnation authority or the power of eminent domain over the National Railroad Passenger Corporation property" (Ex. 27) -- on May 14, 2007, Angela

Miraglia, a DOT Real Estate Specialist, wrote to Sheila Mary Sopper, Project Director of Amtrak Real Estate Development Department, to further inform Amtrak regarding the State's acquisition of "various parcels of private property to allow [DOT] to complete" its work on the Greenway. (Weld Decl. ¶ 24; Ex. 28.)   Ms. Miraglia specifically advised Amtrak in this May 14, 2007 letter that the Commissioner would be acquiring Parcels 105, 107, 108, 109, 110, and 111.  (Weld Decl. ¶ 24; Ex. 28.)  Then, on January 28, 2008, Ms. Miraglia wrote to Ms. Sopper again, providing Amtrak, as required by Article 3 of the EDPL, with "the State's offer of appraised compensation" for Parcels 105, 107, 108, 109, 110, and 111 ($252,275.00 in total), and informing Amtrak that DOT "expect[ed]  to take title to the property . . . within the next few weeks."  (Weld Decl. ¶ 25; Exs. 29-30.)

Three weeks later, on February 19, 2008, the Commissioner filed notices of appropriation and maps with respect to each of these six parcels -- Parcels 105,107, 108, 109, 110, and 111 -- with the Bronx County Clerk, and, on February 20, 2008, these acquisition documents were marked as "recorded or filed" in the Office of the City Register of the City of New York.  (Weld Decl. ¶ 26; Amtrak Dep. at 109:9-110:14, 134:2-135:3; Exs. 1a-1c, 2a-2c, 5-7.)  Thus, as of that date, title in Parcels 105, 107, 108, 109, 110, and 111 was immediately "vest[ed] in the State," pursuant to section 402(A) of the EDPL.  (Weld Decl. ¶ 26); *see* EDPL § 402(A).

By three letters dated February 21, 2008, DOT sent Amtrak copies of the notices of appropriation and maps that had been filed, informing Amtrak that title in these six parcels was now vested in the State and providing the "official notice  . . of  . . . appropriation" required by the EDPL.  (Weld Decl. ¶ 27; Exs. 31-33.)[3]

---

[3] Because Amtrak refused to accept the just compensation that the State offered for its acquisitions of Parcels 105, 107, 108, 109, 110 and 111 by eminent domain, the State Attorney General's Office informed Amtrak on September 28, 2008 that "[p]ursuant to Section 304 of the

### 4.    DOT's October 2009 Notification Regarding Parcel 178

On October 29, 2009, DOT informed Amtrak that it "ha[d] found it necessary to acquire an additional permanent easement" -- Parcel 178 -- for the purpose of constructing and maintaining a bridge over Amtrak's tracks at E. 172nd Street, which was necessary for DOT's completion of its portion of the Greenway.  (Weld Decl. ¶¶ 32-33; Ex. 40.)  For various reasons, including budgetary constraints and Amtrak's unwillingness to cooperate with DOT on the construction aspects of the project, the Commissioner has yet to complete the acquisition of Parcel 178.  (Weld ¶ 34.)  Under section 401(C) of the EDPL, she has ten years from the date the Determination and Findings here were published -- so, until August of 2015 -- to do so.  (*Id.*); *see* EDPL § 401(C).

### E.    Amtrak's Offer to Sell Parcels 105, 107, 108, 109, 110, and 111 to DOT

On August 13, 2009 -- more than a year after the State had *already* taken Parcels 105, 107, 108, 109, 110 and 111 by eminent domain, and completely ignoring this fact -- Ms. Sopper of Amtrak sent a letter to Lillian Robertson of DOT, enclosing Amtrak's proposed "Easement Agreement" with respect to Parcels 107, 108, 109, 110 and 111 and its proposed "Agreement of Sale" with respect to Parcel 105.  (Weld Decl. ¶ 29; Exs. 35-36; Amtrak Dep. at 119:6-120:21, 139:19-142:5, 150:6-22.)  In these proposed Agreements, Amtrak offered to convey to the State the *same exact* interests in these six parcels that the State had already acquired through eminent domain, for the *same exact* amount of compensation.  (Weld Decl. ¶ 30; Exs. 35-38; Amtrak Dep. at 120:17-125:7, 150:23-151:12.)  On August 28, 2009, DOT acknowledged receipt of these materials, but informed Amtrak, once again, that the State had already acquired title to this

---

Eminent Domain Procedure Law, the State Comptroller has deposited the sum of $261,041.55 [the original offer plus interest] in an Eminent Domain account."  (Weld Decl. ¶ 28; Ex. 34.) The sum deposited by the State Comptroller remains in such Eminent Domain account.  (Weld Decl. ¶ 28.)

property, noting that "[t]hese maps were vested 2/2008," and reminded Amtrak that it should execute "[t]he agreement package sent to you on January 28, 2008" in order "[t]o receive just compensation for this property."  (Weld Decl. ¶ 31; Ex. 39.)

F.    **The Present Action**

Despite efforts from various officials in the federal government to resolve the parties' differences here -- most recently an attempt by the U.S. Department of the Interior ("DOI"), emphasizing the importance of the Greenway to DOI, "to explore how Amtrak and the State might become partners in [DOI's] effort to complete the Greenway" -- on April 9, 2012, Amtrak commenced this action.  (Weld Decl. ¶¶ 35-39.)  Amtrak contends that the "Commissioner's purported condemnation of Amtrak's real property in Bronx County, New York under New York's Eminent Domain Procedure Law and Highway Law is preempted by federal law and violates the Supremacy Clause," and it seeks declaratory and injunctive relief, prohibiting the Commissioner from condemning Amtrak's property and declaring past condemnations "null, void, and invalid."  (FAC ¶ 2; *id*. at 14.)

The Commissioner now moves to dismiss for the reasons discussed below.

**ARGUMENT**

**I.**

**THE BULK OF AMTRAK'S CLAIMS ARE
BARRED BY THE ELEVENTH AMENDMENT**

In an effort to avoid the bar of the Eleventh Amendment, Amtrak purports to bring this action against the Commissioner under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908.)  As to nearly all of Amtrak's claims in this case, concerning the parcels of property to which the Commissioner has already acquired title, that effort is without merit.

14

As the Supreme Court has held, "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Va. Office for Prot. & Advocacy* v. *Stewart*, 131 S. Ct. 1632, 1639 (2011) (quoting *Verizon Md. Inc.* v. *Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)); *see also, e.g.*, *Chen* v. *City Univ. of N.Y.*, No. 11 Civ. 0320(CM), 2011 WL 5419792, at *8 (S.D.N.Y. Nov. 9, 2011). Here, all of Amtrak's claims relating to the interests in the six parcels of property the Commissioner has already acquired -- *i.e.*, its claims in Counts I, II, and III of the Amended Complaint seeking declaratory, injunctive, and related relief with respect to Parcels 105, 107, 108, 109, 110, and 111 -- fail both prongs of this inquiry. These claims should therefore be dismissed by the Court under the Eleventh Amendment.

The Second Circuit's decision in *Knight* v. *New York*, 443 F.2d 415 (2d Cir. 1971), is directly controlling. There, plaintiff Luther Knight filed suit in federal court against both the State of New York and its Commissioner of Transportation, alleging that the Commissioner's taking of his property for the State under section 30 of the Highway Law was unlawful, and seeking declaratory and injunctive relief "to set aside the appropriation." *Id.* at 416-17.

Writing for a unanimous court, Judge Friendly held that Knight's suit was barred by the Eleventh Amendment. *Id.* at 417-22. As against the State, the Second Circuit found that the action was prohibited by the plain terms of the Amendment. *Id.* at 417-19.

Moreover, and as relevant here, the Second Circuit also held that the Eleventh Amendment barred Knight's claims against the Commissioner of Transportation. *Id.* at 419-22. Specifically, the *Knight* court concluded that because title to the disputed lands had, pursuant to section 30 of the Highway Law, "vest[ed] in the State immediately upon the filing of a

15

description and map of the property to be appropriated in the office of the county clerk or register of the county in which the property is situated," Knight's effort to defeat that title by a decree against the Commissioner was a claim for retrospective relief seeking to remedy an alleged past violation of federal law.  *Id.* at 416, 419-22.  Thus, just like his causes of action brought directly against the State, Knight's claims against the Commissioner of Transportation were, the Second Circuit held, precluded by the Eleventh Amendment.  *Id.* at 419-22.

*Knight* is indistinguishable from this case.  It is undisputed that here, as in *Knight*, the Commissioner, in acquiring the property in dispute, was exercising her powers of eminent domain pursuant to, among other statutory provisions, section 30 of the Highway Law.  (Ex. 2a at 3; Ex. 2b at 3; Ex. 2c at 8; FAC ¶¶ 2, 16, 63.)  It is also undisputed that, with respect to Parcels 105, 107, 108, 109, 110, and 111, the Commissioner, in February 2008, "fil[ed] . . . a description and map of the property to be appropriated in the office of the county clerk or register of the county in which the property is situated," and that, under New York law, title to each of those six parcels "vest[ed] in the State immediately upon th[at] filing."  *Knight*, 443 F.2d at 416; *see* Highway Law §§ 22, 30; EDPL § 402(A); (Ex. 2a at 1 (Parcel 105); Ex. 2b at 1 (Parcels 107, 108, 109); Ex. 2c at 1 (Parcels 110, 111); Amtrak Dep. at 109:9-110:14, 134:2-135:3; Weld Decl. ¶ 26**.**)

*Knight* has been consistently followed by courts in the Second Circuit, *see, e.g.*, *Jones* v. *Newman*, No. 98 Civ. 7460(MBM), 1999 WL 493429, at *8-9 (S.D.N.Y. June 30, 1999) (reaffirming *Knight*); *Dean* v. *Abrams*, No. 94 Civ. 3704 (LAK), 1995 WL 791966, at *2 n.5 (S.D.N.Y. Dec. 26, 1995) (same); *Blanchette* v. *New York*, 412 F. Supp. 219, 220-22 (S.D.N.Y. 1976) (same).  It is also in complete accord with the general rule that both injunctive and declaratory relief against state officials are barred by the Eleventh Amendment when there is no

16

ongoing violation of federal law and the plaintiff seeks only retrospective relief, *see, e.g.*, *Va. Office for Prot. & Advocacy*, 131 S. Ct. at 1639; *see also, e.g.*, *Ward* v. *Thomas*, 207 F.3d 114, 119-20 (2d Cir. 2000) (declaratory relief).

Thus, under *Knight*, resolution of the Eleventh Amendment question here is easy. All of Amtrak's claims in this action, in Counts I, II, and III, relating to Parcels 105, 107, 108, 109, 110, and 111 are unquestionably barred by the Amendment, and, just as in *Knight*, dismissal of these claims should be granted by the Court with prejudice.[4]

## II.

### AMTRAK'S CLAIMS ARE PRECLUDED ON WAIVER, STATUTE OF LIMITATIONS, AND ABSTENTION GROUNDS

Under settled law -- most notably, this Court's and the Second Circuit's decisions in *Didden* v. *Village of Port Chester*, 322 F. Supp. 2d 385 (S.D.N.Y. 2004) (McMahon, J.) (granting defendants' motion to dismiss), *aff'd* 173 F. App'x 931 (2d Cir. 2006); 304 F. Supp. 2d 548 (S.D.N.Y. 2004) (McMahon, J.) (denying plaintiff's preliminary injunction motion) -- all of Amtrak's claims in this action are precluded on waiver grounds and barred by the applicable statute of limitations. And, in addition, Amtrak's claims with respect to the one parcel of property at issue here to which the State has yet to acquire title (Parcel 178) are also barred under the *Younger* abstention doctrine.

---

[4] It should be noted that to the extent Amtrak may attempt to argue that is somehow exempt entirely from the Eleventh Amendment's bar, that would go nowhere. Simply put, the law is clear that "Amtrak cannot argue that it is a federal entity for purposes of avoiding the bar of the Eleventh Amendment." *Nat'l R.R. Passenger Corp.* v. *Pa. Pub. Util. Comm'n*, No. CIV. A. 86-5357, 1997 WL 597963, at *4 (E.D. Pa. Sept. 15, 1997); *accord United States* v. *Plasser Am. Corp.*, 57 F. Supp. 2d 140, 142 (E.D. Pa. 1999).

A.    **The *Didden* Case**

In *Didden*, this Court was faced with facts similar to those here.  In January 2004, plaintiffs, a group of private developers, filed suit in federal court challenging the condemnation of their land by the Village of Port Chester, New York, and seeking declaratory, injunctive, and monetary relief.  322 F. Supp. 2d at 387; 304 F. Supp. 2d at 557.  Almost five years earlier, in March 1999, the Village had held a public hearing, pursuant to the EDPL, regarding its intentions to acquire plaintiffs' property, along with the land of many others, by eminent domain, in order "to redevelop its blighted waterfront and downtown areas."  304 F. Supp. 2d at 551; *see* EDPL §§ 201, 203.  Advance notice of the public hearing was published in newspapers, and a copy of the notice was also sent directly to plaintiffs.  304 F. Supp. 2d at 551; *see* EDPL § 202. Following the public hearing, the Village, on July 14, 1999, issued its "Determination and Findings" under Article 2 of the EDPL, in which it made a finding of public purpose for condemnation of the properties at issue. 304 F. Supp. 2d at 551; *see* EDPL §204.

Under the EDPL, this Court noted, plaintiffs had "30 days after July 14, 1999 to appeal the [Village]'s findings."  304 F. Supp. 2d at 551; *see* EDPL § 207.[5]  However, "[p]laintiffs took no such appeal."  *Id.*  Instead, the *Didden* plaintiffs waited until January 16, 2004 -- nearly five years after receiving notice of the public hearing, and well over four years after the Village issued its "Determinations and Findings" -- to commence their action in this Court challenging the Village's condemnation of their property.  *Id.* at 557.

---

[5] Specifically, EDPL § 207 provides that, "within thirty days after the condemnor's completion of its publication of its determination and findings," affected property owners must bring suit in the Appellate Division in order to challenge whether: (i) "the [condemnation] proceeding was in conformity with the federal and state constitutions"; (ii) "the proposed acquisition is within the condemnor's statutory jurisdiction or authority"; (iii) "the condemnor's determination and findings were made in accordance with the procedures set forth in this article and with article eight of the environmental conservation law"; or (iv) "a public use, benefit or purpose will be served by the proposed acquisition."  EDPL § 207.

This Court rejected plaintiffs' claims in *Didden*, both denying them preliminary injunctive relief, *id.*, and granting defendants' motion to dismiss plaintiffs' complaint, 322 F. Supp. 2d at 388.  The Second Circuit affirmed.  173 F. App'x at 933.

Among the grounds for the Court's decision in *Didden* are three that are particularly relevant -- and dispositive -- here: (i) plaintiffs' waiver of their claims by failing to avail themselves of the judicial review available pursuant to EDPL § 207; (ii) the statute of limitations; and (iii) *Younger* abstention.  As they did in *Didden*, these three grounds also mandate dismissal of Amtrak's claims in this action.

**B.    All of Amtrak's Claims Are Barred on Waiver Grounds**

This Court's straightforward waiver holding in *Didden* is fully applicable to this case, and a sufficient basis, by itself, for dismissal of all of Amtrak's claims.

As the Court held in *Didden*, because plaintiffs -- though they "were fully aware of the consequences of the [Village's] condemnation findings," and "also had notice of the public hearings that preceded the findings" -- failed to bring a judicial challenge within thirty days after publication of the Village's July 14, 1999 "Determination of Findings," as required by EDPL § 207, they had forever "waived their right" to do so.  322 F. Supp. 2d at 389-90; 304 F. Supp. 2d at 560.  That is precisely the situation here.

As discussed above, *see supra* pp. 9-10, Amtrak indisputably had notice of the public hearing held by DOT on May 19, 2005, concerning the development of the Bronx River Greenway Project between Westchester Avenue and East Tremont Avenue in the Bronx, and the condemnation of the property at issue in this case.  At least by May 11, 2005, when Roger Weld of DOT sent an e-mail to Earl Watson of Amtrak so informing him, Amtrak was on notice both of the hearing and that DOT was planning to acquire the property in dispute here by eminent

19

domain.  (Weld Decl. ¶¶ 15-17; Ex. 22; Amtrak Dep. at 216:21-223:20, 224:5-17.)  And by the

next day, May 12, 2005, numerous other officials at Amtrak were specifically made aware of the

condemnation proceedings as well.  These officials included Amtrak's in-house legal counsel,

who would certainly know that Amtrak had a continuing "obligation to exercise due diligence to

ascertain the status of the condemnation proceedings," 322 F. Supp. 2d at 390, as well as other

"appropriate people who were in authority to address the issue" (Weld Decl. ¶ 17; Ex. 22;

Amtrak Dep. at 226:8-227:8, 229:24-232:8, 239:2-240:18.)[6]

Following the public hearing (which Amtrak declined to attend, *see supra* p.10) and the

subsequent May 29, 2005 deadline for making written submissions to the administrative law

judge (which Amtrak did not avail itself of, *see supra* p.10), on August 17, 2005, DOT issued its

"Determination and Findings" with respect to the Bronx River Greenway Project and its

acquisitions of the Amtrak property at issue.  (Weld Decl. ¶ 20; Exs. 24-25)  Newspaper

publication of the Determination and Findings occurred on August 19, 2005.  (Weld Decl. ¶ 21;

Exs. 24-26.)  And, as Mr. Watson admitted at his 30(b)(6) deposition, Amtrak was aware of

DOT's issuance of this Determination and Findings.  (Amtrak Dep. at 247:8-25, 249:9-14.)[7]

---

[6] It should also be noted that Amtrak has raised no claim that DOT's notice of the public hearing
did not comply with the requirements of the EDPL, that any such argument would have no effect
on the validity of the Commissioner's takings, *see* EDPL § 202(D), and that Amtrak's time for
making such an argument has long since passed, *see* EDPL 207(C)(3); *see also, e.g.*, *In re N.Y.
State Urban Dev. Corp.*, 26 Misc. 3d 1228(A), 2010 WL 702319, at *19-20 (Sup. Ct. Kings
Cnty. Mar. 1, 2010) (finding that, if claim subject to judicial review under EDPL § 207 accrues
only after the time of the publication of the determination and findings, that claim must still be
brought within 30 days of that subsequent date, or else it is time-barred).

[7] Moreover, as with the notice of the public hearing, it should also be noted Amtrak has not
raised a claim that publication of the Determination and Findings was somehow deficient under
the EDPL, no such claim would affect the validity of the State's acquisition of title to these
parcels, and, in any event, any such claim was time-barred long ago.  *See supra* note 6.

But Amtrak did not bring a judicial challenge to DOT's findings in state court "within thirty days" of newspaper publication, as required by the EDPL.  EDPL § 207.[8]  Thus, under this Court's holding in *Didden*, it has waived its right to do so now.  322 F. Supp. 2d at 389-90; 304 F. Supp. 2d at 560.  Any other result here, as this Court put it in *Didden*, "would contradict the express provisions of the EDPL, and undermine New York's constitutional unitary scheme for the condemnation of property."  304 F. Supp. 2d at 560; *see also Buffalo S. R.R.* v. *Village of Croton-on-Hudson*, 434 F. Supp. 2d 241, 254 (S.D.N.Y. 2006) (McMahon, J.) (noting that, under the EDPL, "only intervention by a court early in the condemnation process can stave off a taking that the [condemnor] is determined to make").

That Amtrak is challenging the Commissioner's authority to take its property by eminent domain, and not, like plaintiffs in *Didden*, challenging the public purpose of the takings, does nothing to change the analysis.  Both issues are covered by the judicial review provided under section 207 of the EDPL, *see infra* note 5, and, under that provision, both had to be raised by Amtrak in a state proceeding long ago.  EDPL § 207.

Thus, under *Didden*, Amtrak has waived all of its claims, and, on that basis alone, this action should be dismissed by the Court as a matter of law.

---

[8] Because Amtrak did not attend or raise any issues at the public hearing, even an Appellate Division action within this 30-day period would likely have been too late.  Under EDPL § 207, a challenger is limited to arguing in state court only those issues that were raised at the public hearing or in submissions to the condemnor while its record remained open.  *See, e.g.*, *Matter of Waldo's, Inc.* v. *Vill. of Johnson City*, 74 N.Y.2d 718, 722 (1989) ("At the public hearing petitioner was free to present any evidence to undermine the bona fides of the legislative body's decision-making process.  Having failed to do so, petitioner cannot now be heard to complain.); *Sun Co.* v. *City of Syracuse Indus. Dev. Agency*, 209 A.D.2d 34, 44 (4th Dep't 1995) ("We do not reach the issue . . . . Upstate failed to raise the issue during the EDPL proceedings, and it may not raise it now.").

C.    __All of Amtrak's Claims Are Barred on Statute of Limitations Grounds__

Amtrak's claims here are also barred on statute of limitations grounds.  *Didden*, once again, is on point and controlling.

In *Didden*, both this Court and the Second Circuit held that plaintiffs' claims were precluded by the three-year statute of limitations applicable to 42 U.S.C. § 1983 claims.  173 F. App'x at 933; 322 F. Supp. 2d at 388-89; 304 F. Supp. 2d at 558-59.  As the Second Circuit found, affirming this Court, plaintiffs' claims challenging the condemnation of their property accrued when the Village of Port Chester issued its Determination and Findings in that case, on July 14, 1999.  173 F. App'x at 933; *accord* 322 F. Supp. 2d at 388; 304 F. Supp. 2d at 558.  By that time, as this Court explained, plaintiffs had notice of the public hearing preceding the Village's findings, "were fully aware that a finding of public purpose would expose their property to the prospect of condemnation," and thus indisputably "had reason to know of the basis of their injury."  322 F. Supp. 2d at 389, *aff'd*, 173 F. App'x at 933; 304 F. Supp. 2d at 558.  Thus, because the *Didden* plaintiffs did not bring suit until January 16, 2004 -- more than four years after their claims accrued -- their action, this Court and the Second Circuit held, was plainly time-barred.  173 F. App'x at 933; 322 F. Supp. 2d at 389; 304 F. Supp. 2d at 559.

The relevant facts in this case are no different.  As noted, Amtrak had notice of DOT's public hearing regarding the condemnation of its property by at least May 11, 2005.  And immediately thereafter, as Mr. Watson testified, this eminent domain issue became one of "paramount importance to Amtrak" -- *i.e.*, "a red flag issue and something that Amtrak would want to respond to immediately and take whatever protective measures it would need to at the time."  (Amtrak Dep. at 238:16-20, 240:11-18; *see* 218:24-220:6.)

Thus, under *Didden*, Amtrak's claims against the Commissioner accrued no later than August 17, 2005, when DOT issued its Determination and Findings here.  *See* 173 F. App'x at 933; 322 F. Supp. 2d at 388; 304 F. Supp. 2d at 558; (Weld Decl. ¶ 20; Exs. 24-25).  By then, Amtrak, just like plaintiffs in *Didden*, certainly "had reason to know of the basis of [its] [alleged] injury."  173 F. App'x at 933.

Yet, Amtrak did not commence this action until April 9, 2012 -- nearly seven years after it received notice of the public hearing, and well over six and a half years after DOT issued and published its Determination and Findings.  Under settled law, that is much too late.

Unlike *Didden*, this is not a § 1983 case, so the three-year statute of limitations applicable to such claims does not govern.  But that does nothing to help Amtrak's cause.  Its preemption claims, brought pursuant to the Supremacy Clause, are simply subject to the general rule that, where no specific limitations period is provided for a federal cause of action, "the applicable limitations period . . . is 'that specified in the most nearly analogous limitations statute' of the forum state."  *Muto* v. *CBS Corp.*, 668 F.3d 53, 57 (2d Cir. 2012) (quoting *Miles* v. *N.Y. State Teamsters Conf. Pension & Ret. Fund Pension Benefit Plan*, 698 F.2d 593, 598 (2d Cir. 1983)); *see, e.g.*, *Hollander* v. *Brezenoff*, 787 F.2d 834, 837 (2d Cir. 1986) (setting forth this rule).

Here, "the most nearly analogous limitations statute" is surely section 207 of the EDPL.  *See Goldstein* v. *N.Y. State Urban Dev. Corp.*, 13 N.Y.3d 511, 520-522 (2009) (holding that "the 30-day filing period" of EDPL 207 is "a special limitations period within which review of condemnation determinations must be sought").  As discussed above, that provision would govern judicial review of a state court action bringing the same challenges to the Commissioner's eminent domain authority as Amtrak brings in this suit, and seeking precisely the same relief.  EDPL § 207.  EDPL § 207 expressly provides a 30-day limitations period for

such claims.  EDPL § 207(A); *see Goldstein*, 13 N.Y.3d at 520-522.  Amtrak's present suit --

filed over six and a half years after its claims against the Commissioner accrued, in August 2005

-- falls well short of that 30-day deadline.

In sum, all of Amtrak's claims are time-barred under the statute of limitations.  Dismissal

on that independent basis is thus fully warranted.

### D.    Amtrak's Claims with Respect to Parcel 178 Should Be Dismissed under the *Younger* Abstention Doctrine

Finally, Amtrak's claims with respect to Parcel 178, the one parcel of property in

dispute to which the State has not yet acquired title, are also precluded under the *Younger*

abstention doctrine, "which prohibits federal courts from interfering with ongoing state

proceedings."  *Donahue* v. *Mangano*, --- F. Supp. 2d ----, 2012 WL 3561796, at *9 (E.D.N.Y.

Aug. 20, 2012) (citing *Younger* v. *Harris*, 401 U.S. 37 (1971)); *see Spargo* v. *N.Y. State Comm'n

on Jud. Conduct*, 351 F.3d 65, 74-75 (2d Cir. 2003).

*Didden* is again dispositive.  As the Court noted there, the *Younger* doctrine applies not

only where there are ongoing proceedings in state court, but also in the context of state

administrative proceedings.  304 F. Supp. 2d at 563-64 (citing *Middlesex Cnty. Ethics Comm'n

v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)); 322 F. Supp. 2d at 388 (citing *Paul* v.

*N.Y. State Dep't of Motor Vehicles*, No. 02 Civ. 8839, 2003 WL 253065 (S.D.N.Y. Feb. 3,

2003)); *accord, e.g., Parent* v. *New York*, No. 11-2474-cv, 2012 WL 2213658, at *2 (2d Cir.

June 18, 2012).  And, in particular, this Court held, *Younger* applies to ongoing EDPL

proceedings, as long as (i) plaintiffs "had an adequate opportunity to raise their federal claims" in

the EDPL proceeding, and (ii) the EDPL proceeding was not "commenced in bad faith."

*Didden*, 304 F. Supp. 2d at 564 (noting that "New York eminent domain proceedings always

satisfy the first two prongs of *Younger*" -- *i.e.*, they are "judicial in nature" and "implicate

important state interests").  Just as in *Didden*, all of these requirements for *Younger* abstention are satisfied here.

*First*, with respect to Parcel 178, the state eminent domain proceeding is plainly ongoing. As this Court explained in *Didden*, "[t]he EDPL sets forth a staged process for addressing the various issues that arise during a condemnation -- each stage being the subject of its own section (article) of the EDPL," and, together, all "five stages . . . constitute a single, unitary proceeding." *Id.*; *see also id.* at 568 (noting that "the Condemnation Proceeding is one unified judicial proceeding").  Here, like in *Didden*, the Article 2 stage is complete.  (It ended in September 2005, when, following the public hearing and the DOT's issuance of its Determination and Findings, neither Amtrak nor any other aggrieved property holder sought judicial review in the Appellate Division, pursuant to EDPL § 207, "within thirty (30) days after the completion and publication of the determination and finding."  *Id.* at 564.)  But the remaining stages -- Article 3 (which "controls the making of compensation offers," *id.* at 565), Article 4 (by which the condemnor "effects the taking of the property," *id.*), and Article 5 (where "[i]f, after title passes, the amount to be paid for the property remains in dispute, compensation is adjudicated in the Court of Claims," *id.*) -- have yet to be commenced.

Under EDPL § 401(C), the Commissioner has ten years from the date the Determination and Findings were published to effect its taking of Parcel 178 pursuant to Article 4.  EDPL § 401(C); *see Didden*, 304 F. Supp. 2d at 568 (holding that, under EDPL § 401, "Defendants had the right to initiate the phase three proceeding at any point within 10 years of the commencement of the Condemnation Proceeding before it would be considered abandoned").  Thus, unless the

condemnation of Parcel 178 is completed before then, this "single, unitary proceeding" will remain ongoing until at least August of 2015.[9]

*Second*, as in *Didden*, "the New York EDPL provides an adequate mechanism for addressing [Amtrak's] federal constitutional claims." 304 F. Supp. 2d at 564. As discussed above, however, the time for Amtrak to raise such a claim -- *i.e.*, its claims, asserted here, that the Commissioner's power to take Amtrak property by eminent domain is preempted by "the Rail Act, RPSA, as amended, or Title 49," (FAC at 14) and that, under the Supremacy Clause, "the proposed acquisition" is thus not "within the condemnor's . . . authority," EDPL § 207 -- was during the Article 2 stage of the proceedings. *See id.* at 565-67. That Amtrak failed to take advantage of its opportunity then is of no moment. Like the plaintiffs in *Didden*, Amtrak had notice of the Article 2 proceedings. *Id.* at 566; *see supra* pp. 9-11. It simply declined to raise in those proceedings its concerns about the Commissioner's authority to condemn Amtrak property that it attempts to raise in this Court now.

As this Court found in *Didden*, such a failure by a condemnee to act when it could does nothing to change the *Younger* analysis. *See id.* at 566-67. Pursuant to EDPL § 207, Amtrak, like the plaintiffs in *Didden*, "had adequate opportunity to raise [its] federal claims in state court." *Id.* at 567. For abstention purposes, that is all that is required. *See id.* at 566-67.

*Third*, Amtrak makes no allegation that DOT's condemnation proceedings here were "brought in bad faith." *Id.* at 567. Nor could it. As even Amtrak must concede, the Commissioner instituted the proceedings to condemn Amtrak property "for the purpose of the Bronx River Greenway Project," (FAC ¶¶ 13-14) -- a patently legitimate aim. *See, e.g.*,

---

[9] Because a condemnee has "three years after service of the notice of acquisition or date of vesting," EDPL § 503, to challenge the just compensation amount in the Court of Claims, these proceedings could, indeed, remain ongoing well after August 2015.

*Diamond "D" Constr. Corp.* v. *McGowan*, 282 F.3d 191, 199 (2d Cir. 2002) ("To invoke this

[bad faith] exception, the federal plaintiff must show that the state proceeding was initiated with

and is animated by a retaliatory, harassing, or other illegitimate motive.")

       Accordingly, under *Didden*, Amtrak's claims with respect to Parcel 178 should also be

dismissed on *Younger* abstention grounds.[10]

_____

[10]  *Goldstein* v. *Pataki*, No. 06 CV 5827(NGG) (RML), 2007 WL 1695573 (E.D.N.Y. Feb. 23,
2007) *adopted in part and rejected in part by* 488 F. Supp. 2d 254 (E.D.N.Y. 2007), *aff'd*, 516
F.3d 50 (2d Cir. 2008), does not compel a different result here.  In that case, which also involved
a federal court challenge to a taking under New York's eminent domain law, the magistrate
judge (in a decision that was adopted by the district judge, 488 F. Supp. 2d at 478, but neither
raised nor considered in the Second Circuit, 516 F.3d 50) found that *Younger* abstention did not
apply because "there [wa]s no state proceeding pending that can clearly be considered 'judicial
in nature' and in which plaintiffs will have the opportunity to assert their federal claims."  2007
WL 1695573, at *14 n.28.  Although, in reaching this decision, the magistrate judge purported to
distinguish *Didden* -- finding it inapplicable "because, at the time of the court's decision in that
case, the state condemnation proceeding was at the Article 4 stage, and "[t]here can be no doubt
that an Article 4 proceeding is 'judicial in nature,'" *id.* -- he, in truth, rejected this Court's
holding in *Didden* that the entire five-stage EDPL process is "one unified judicial proceeding."
*Didden*, 304 F. Supp. 2d at 568; *see id.* at 564.  Indeed, according to the magistrate judge in
*Goldstein*, "[t]he EDPL is a single legislative scheme with sequential proceedings, some of
which are judicial and some of which are not."  2007 WL 1695573, at *14 n.28.  That assertion
is simply contrary to this Court's clear holding in *Didden*.  *See* 304 F. Supp. 2d at 568.  It should
not be followed here.

**III.**

**AMTRAK'S PREEMPTION CLAIMS ALSO
FAIL, AS A MATTER OF LAW, ON THE MERITS**

The Commissioner is also entitled to summary judgment here because each of Amtrak's federal preemption claims -- for express preemption under the RPSA and 49 U.S.C. 24902(j), and for implied preemption under the Rail Act, the RPSA, and pursuant to the federal government's mortgage interest in Amtrak's property -- fails on the merits as a matter of law.

Contrary to Amtrak's assertions in the Amended Complaint, under a proper preemption analysis, it is clear that nothing in the federal statutes relied on by Amtrak or in the federal government's mortgage on Amtrak's property preempts the Commissioner's power to take the parcels at issue here by eminent domain. Indeed, as we discuss below, Amtrak's attempt to reverse these takings and to preclude the State from exercising this "necessary attribute of sovereignty," *W. 41st St. Realty LLC* v. *New York State Urban Dev. Corp.*, 298 A.D.2d 1, 5 (1st Dep't 2002) (quoting *People* v. *Adirondack Ry. Co.*, 160 N.Y. 225, 236-37 (1899), *aff'd*, 176 U.S. 335 (1900)), finds no support in the facts or the law. Summary judgment dismissing each of Amtrak's preemption claims is thus fully warranted.

**A.    The Law of Federal Preemption**

As this Court has noted, "[t]he 'Constitution establishes a system of dual sovereignty between the States and the Federal Government,' in order to 'reduce the risk of tyranny and abuse from either front.'"  *U.S. Smokeless Tobacco Mfg. Co.* v. *City of New York*, 703 F. Supp. 2d 329, 331 (S.D.N.Y. 2010) (McMahon, J.) (quoting *Gregory* v. *Ashcroft*, 501 U.S. 452, 457 (1991)); *see also, e.g.*, *Arizona* v. *United States*, 132 S. Ct. 2492, 2500 (2012) ("Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect.").  "This balance of

28

power translates into sovereignty for the states that is 'concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause.'" *Smokeless Tobacco*, 703 F. Supp. 2d at 332-33 (quoting *Tafflin* v. *Levitt*, 493 U.S. 455, 458 (1990)); *see Niagara Mohawk Power Corp.* v. *Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 94 (2d Cir. 2012).

That Clause, Article VI, Clause 2 of the Constitution, provides that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Under this principle" the Supreme Court has explained, "Congress has the power to preempt state law." *Arizona*, 132 S. Ct. at 2500; *see also Smokeless Tobacco*, 703 F. Supp. 2d at 333 ("Preemption is the vehicle used to operationalize Congress' grant of power under the Supremacy Clause."). And, as this Court has noted, "[e]very instance of preemption falls into one of two overarching categories: express or implied." *Smokeless Tobacco*, 703 F. Supp. 2d at 333.

"Express preemption involves an express statement by Congress that prohibits state and local governments from enacting laws in a specific area." *Id.*; *see Arizona*, 132 S. Ct. at 2500-01. "By contrast, implied preemption, which is also referred to as 'conflict preemption,' occurs in two circumstances -- either 'where it is impossible for a private party to comply with both state and federal law' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Smokeless Tobacco*, 703 F. Supp. 2d at 334 (quoting *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 362, 372-73 (2000)).

Under either category of preemption -- express or implied -- the Court's "task is to determine whether, and to what extent, Congress intended to preempt state law." *Niagara Mohawk*, 673 F.3d at 95; *see 23-34 94th St. Grocery Corp.* v. *N.Y.C. Bd. of Health*, 685 F.3d

29

174, 180-81 (2d Cir. 2012).  In undertaking this task, the Supreme Court has held, "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'"  *Arizona*, 132 S. Ct. at 2501; *see 23-34 94th St. Grocery Corp.*, 685 F.3d at 181; *see also Smokeless Tobacco*, 703 F. Supp. 2d at 335-36 (noting that this assumption applies "in all preemption cases, and especially those in which Congress has 'legislated . . . in a field in which the States have occupied'").  And, as particularly relevant here, that same assumption also applies with respect to "state laws that govern the scope and contours of an entity's interests and rights in property."  *Export-Import Bank of U.S.* v. *Asia Pulp & Paper Co.*, 609 F.3d 111, 117 (2d Cir. 2010) (citing *Franks Inv. Co. LLC* v. *Union Pac. R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010) (en banc)).[11]

Moreover, as in any case involving questions of congressional intent, courts deciding preemption claims should avail themselves of all the usual tools of statutory interpretation. Thus, "[i]f the text of the statute is ambiguous, either as to Congress's intent to preempt at all or as to the extent of an intended preemption, the meaning of the statute may be gleaned from its context and from the statutory scheme as a whole, or by resort to the normal canons of construction and legislative history."  *In re WTC Disaster Site*, 414 F.3d 352, 372 (2d Cir. 2005); *accord 23-34 94th St. Grocery Corp.*, 685 F.3d at 181.  And notably, where, as here, the agency responsible for implementing the federal statute at issue has given its view, even in informal guidance, as to the statute's impact on and relationship to the relevant state law, that view may be entitled to some deference by the courts.  *See, e.g.*, *N.Y. State Rest. Ass'n* v. *N.Y.C. Bd. of Health*, 556 F.3d 114, 130 (2d Cir. 2009) (citing *Skidmore* v. *Swift & Co.*, 323 U.S. 134, 140

---

[11] Indeed, as this Court has noted, any attempt by the federal government to preempt state authority in such "areas of law traditionally reserved to the states," *Export-Import Bank*, 609 F.3d at 117 (quoting *Franks*, 593 F.3d at 407), would raise serious Tenth Amendment concerns. *See Smokeless Tobacco*, 703 F. Supp. 2d at 333.

(1944)); *see also Wyeth* v. *Levine*, 555 U.S. 555, 576-77 (2009) ("While agencies have no special authority to pronounce on pre-emption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'").

In the end, as this Court has held, the question "whether a specific state action is preempted requires a fact-specific inquiry." *Buffalo S. R.R. Inc.*, 434 F. Supp. 2d at 249. We undertake that inquiry -- as to each of Amtrak's preemption claims, and applying the governing legal standards just discussed -- below.

**B.    Amtrak's Claims for Express Preemption Are Without Merit**

Amtrak brings express preemption claims in this action under both 49 U.S.C. § 24301(g) and 49 U.S.C. § 24902(j).  (FAC ¶¶ 62-63, 65.)  Neither has any merit.

**1.    No Express Preemption Under 49 U.S.C. § 24301(g)**

Section 24301(g) of the RPSA provides that "[a] State or local law related to rates, routes, or service does not apply to Amtrak in connection with rail passenger transportation."  49 U.S.C. § 24301(g).  Amtrak contends, in Count III of the Complaint, that this statutory provision expressly preempts the Commissioner's "power of eminent domain with respect to Amtrak's property" -- and thus, according to Amtrak, "prohibit[s]" and "void[s]" the Commissioner's takings of the seven parcels at issue in this case.   (FAC ¶¶ 62-63.)  This express preemption claim, which finds no support in the record or in the applicable case law, is wholly without merit.

As an initial matter, Amtrak has yet to advance any argument, or produce any evidence, as to how the Commissioner's use of her eminent domain powers to take the parcels at issue here affects, even indirectly, its "rates, routes, or service." 49 U.S.C. § 24301(g). Amtrak's 30(b)(6) witness, Earl Watson, in fact admitted at his deposition that there is no such effect. Mr. Watson

testified unequivocally that since the time the Commissioner acquired Parcels 105, 107, 108, 109, 110, and 111 in February 2008, those acquisitions by DOT have not had "any effect" on "[t]he fares Amtrak charges," have "not affected [Amtrak's] routes," and have not "affected any services offered by Amtrak." (Amtrak Dep. at 151:13-152:21); *see* 49 U.S.C. § 241012 (defining "rate" for purposes of this provision as "a rate, *fare*, or charge for rail transportation" (emphasis added)). Mr. Watson likewise testified that he could not contemplate any future impact that DOT's acquisitions would have on Amtrak's rates, routes, or service. (Amtrak Dep. at 212:10-17 ("I don't see an impact [on "the future rates Amtrak charges for rail service"], no."); *id.* at 213:15-23 ("I don't think the acquisition will have an impact on Amtrak's routes."); *id.* at 213:24-214:4 ("Q. Will it have an impact on the services offered by Amtrak? . . . A. I would say no.").

Thus, by its own deposition testimony, Amtrak has conceded that it has no claim here. *See, e.g.*, *Sabre* v. *First Dominion Capital, LLC*, No. 01 Civ. 2145(BSJ)(HBP), 2001 WL 1590544, at *1 (S.D.N.Y. Dec. 12, 2001) ("A 30(b)(6) witness testifies as a representative of the entity, his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity."); *accord United States ex rel. Sasaki* v. *N.Y. Univ. Med. Ctr.*, No. 05 Civ. 6163 (LMM)(HBP), 2012 WL 220219, at *9 (S.D.N.Y. Jan. 25, 2012). And Amtrak certainly has not produced, as it must to defeat summary judgment, "sufficient evidence" to support its express preemption claim. *See, e.g.*, *Abundance Partners LP* v. *Quamtel, Inc.*, 840 F. Supp. 2d 758, 766 (S.D.N.Y. 2012) (McMahon, J.) (noting that, to defeat summary judgment, a non-moving party must produce "sufficient evidence" to support its claims and "may not rely on conclusory allegations or unsubstantiated speculation")

But even without Mr. Watson's concessions, and even if it had evidence to support its assertions, Amtrak's claim would still fail as a matter of law.  Under even the most generous reading of the record, the only possible argument Amtrak might make for express preemption under section 23401(g) is an exceedingly broad one -- *i.e.*, that because DOT plans to undertake certain limited construction work on the acquired parcels for purposes of the Bronx River Greenway project and because "if that construction work were done and if that construction work showed some sort of environmental problems and if those environmental problems led to financial liability," that financial liability would reduce Amtrak's operating funds, and thus would indirectly affect Amtrak's rates, routes, and service.  (Amtrak Dep. at 214:5-215:13.)

As the Second Circuit has made clear, however, the preemptive scope of section 24301(g) is not so boundless.  *City of New York* v. *National Railroad Passenger Corp.*, 373 F. App'x 84 (2d Cir. 2010), is directly applicable.  There, the City of New York brought an action against Amtrak seeking to recover the City's expenditures in removing and relocating Amtrak's electrical facilities from beneath City-owned bridges.  *Id.* at 84.  As in this case, the parties in *City of New York* cross-moved for summary judgment, and, as a part of its motion, Amtrak argued that any liability it had to the City for these removal and relocation costs, as well as any award of pre-judgment interest to the City even if Amtrak were liable, was "prohibited by 49 U.S.C. § 24301(g)."  No. 06-CV-793, 2009 WL 483343, at *6 (E.D.N.Y. Feb. 25, 2009) (district court decision on pre-judgment interest);  No. 06-CV-793, 2008 WL 5169636, at *1 (E.D.N.Y. Dec. 8, 2008) (district court decision on summary judgment); *see* 373 F. App'x at 85.

Specifically, Amtrak argued that the City's claim was "expressly preempted by § 24301(g)" because any recovery of removal and relocation expenses or pre-judgment interest by the City "would reduce the operating funds that Amtrak has available to allocate or otherwise

33

take into account when reassessing and/or modifying its rates, routes, or service," and it, "therefore, has a connection with and effect upon, and is thus related to, Amtrak's ability to provide its services, and to use its facilities, in a cost-effective manner." Brief for Defendant-Appellant at 49-51, *City of New York*, 373 F. App'x 84 (No. 09-1200), *available at* 2009 WL 7856700; *see id.* at 22 (arguing that "the City's claims are expressly preempted by 49 U.S.C. § 24301(g) because diverting part of Amtrak's federal appropriation to the City's bridge maintenance program necessarily would have an effect upon, and is thus related to, Amtrak's ability to fulfill its congressional mandate of managing its own facilities, and providing intercity rail passenger service, in a cost-effective manner"); *id.* at 55-56 (arguing that both the "relocation cost award" and the "award of prejudgment interest" against Amtrak "are precisely the types of state and local impositions which Congress intended to preempt because they divert appropriated funds from, and adversely affect, Amtrak's operations and services").[12]

Despite Amtrak's arguments, including its assertion that express preemption was "indisputabl[e]," 2007 WL 4914428, its broad interpretation of section 24301(g) was rejected by both the district court and the Second Circuit in *City of New York*. 373 F. App'x at 85; 2009 WL 483343, at *6; 2008 WL 5169636, at *7. And properly so. As the Supreme Court has observed,

---

[12] *See also* Defendant National Railroad Passenger Corporation's Memorandum of Law in Support of Its Motion for Partial Summary Judgment, *City of New York*, 2008 WL 5169636, *available at* 2007 WL 4914428 (arguing that "the City's attempt to impose costs upon Amtrak for the relocation of the electrical facilities indisputably has 'a connection with or reference to' Amtrak's rates, routes, or services because applying such impositions to Amtrak's property would restrict Amtrak's ability to determine the use to which its rail properties could be put, thus affecting Amtrak's routes"); Defendant's Memorandum of Law in Opposition to Plaintiff's Request for Prejudgment Interest, *City of New York*, 2009 WL 483343, *available at* 2009 WL 1933938 (arguing that "the City's proposed prejudgment interest award would diminish, and thus at least indirectly affect, the operating funds that Amtrak has available to allocate or otherwise take into account when reassessing and/or modifying its rates, routes, or service" and thus "an award of prejudgment interest . . . would have both a connection with and an effect upon Amtrak's rates, routes, or service, and for that reason is preempted by 49 U.S.C. § 24301(g)").

if the phrase "related to" "were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for 'really, universally, relations stop nowhere.'" *N.Y. State Conf. of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U.S. 645, 655 (1995). Although Amtrak has certainly urged such a reading of the RPSA, that was plainly not Congress's intention under the statute. *See, e.g.*, *Haynes* v. *Nat'l R.R. Passenger Corp.*, 423 F. Supp. 2d 1073, 1080-81 (C.D. Cal. 2006) (rejecting Amtrak's overbroad interpretation of § 23401(g), under which "any law leading to increased costs would necessarily lead to increased rates and therefore be preempted by" the RPSA). Amtrak's express preemption claim under section 24301(g) accordingly fails as a matter of law.

## 2.    No Express Preemption Under 49 U.S.C. § 24902(j)

Amtrak's second claim for express preemption, under 49 U.S.C. § 24902(j), also fails as a matter of law.

The language of section 24902(j) is itself decisive here. It provides, in relevant part, that:

> No State or local building, zoning, subdivision, or similar or related law, nor any other State or local law from which *a project* would be exempt if undertaken by the Federal Government or an agency thereof within a Federal enclave wherein Federal jurisdiction is exclusive . . . shall apply in connection with the construction, ownership, use, operation, financing, leasing, conveying, mortgaging or enforcing a mortgage of (i) *any improvement undertaken by or for the benefit of Amtrak* as part of, or in furtherance of, the Northeast Corridor Improvement Project . . . or (ii) any land (and right, title or interest created with respect thereto) *on which such improvement* is located and adjoining, surrounding or any related land.

49 U.S.C. § 24902(j) (emphases added). Thus, by its terms, section 24902(j) preempts only state and local laws that burden certain improvement projects undertaken by or for the benefit of Amtrak. *Id.* Simply put, that is not this case.

To the contrary, Amtrak has produced no evidence at all of "any improvement undertaken by or for the benefit of Amtrak" to which the Commissioner's takings of the parcels at issue here has any connection -- not in its pleadings, not in its deposition testimony, and not in any document it has produced in discovery.  Indeed, while the documents "encompassing Amtrak's plans and vision for the Northeast Corridor" set forth "a lot of particular projects" Amtrak has planned in the coming years, they make no mention whatsoever of any specific plans for improvement projects on or around these parcels.  (Amtrak Dep. at 190:20-191:10, 208:24-210:15; *see id.* at187:9-191:10, 191:19-196:19, 198:23-200:20, 202:3-11, 206:16-211:14; Exs. 10-12.)

Instead of offering such evidence, Amtrak premises its express preemption claim here on the bald assertion that that "New York eminent domain and highway law is . . . preempted by 49 U.S.C. § 24902(j) . . . because state law cannot be used to condemn rail property in what amounts to a federal enclave."  (FAC ¶ 65.)  Nowhere, however, does Amtrak provide any support for this exceedingly broad articulation of section 24902(j) preemption.  And, once again, the Second Circuit's decision in *City of New York* v. v. *National Railroad Passenger Corp.*, 373 F. App'x 84, makes clear that Amtrak's near limitless view of federal preemption is not, in fact, the law.

Specifically, in *City of New York*, along with its arguments under section 23401(g), Amtrak also argued that the City's claim for an award of prejudgment interest under state law was expressly barred by section 24902(j) "because prejudgment interest could not be awarded against the federal government if it had undertaken the electrical facility relocation project."  Def.'s Mem. of Law in Opp'n to Pl.'s Request for Prejudgment Interest, 2009 WL 1933938; *see also* Br. for Def.-Appellant, 2009 WL 7856700, at 21, 56; Reply Br. for Def.-Appellant, 2009

36

WL 7856702, at 28-29.  In short, Amtrak's position was that, under section 24902(j), "Amtrak is protected from state and local financial or regulatory impositions in connection with [its] property to the same extent that the federal government would be protected" -- and even where, as in that case, the only improvement project at issue was concededly neither "undertaken by" nor "for the benefit of" Amtrak.  2009 WL 7856702, at 29; *see* Appellee's Br., 2009 WL 7856701, at 62-63 (noting Amtrak's insistence that the City's removal and relocation project "was of no benefit to Amtrak").  Both the district court and the Second Circuit rejected these overbroad express preemption arguments.  373 F. App'x at 85; 2009 WL 483343, at *4.

Here, Amtrak offers a similarly boundless interpretation of section 24902(j).  Mr. Watson, in fact, asserted at his 30(b)(6) deposition that even the State's taking of "a pin-sized dot on Amtrak's property" by eminent domain was precluded by federal law -- no matter, it seems, if there was "any improvement undertaken by or for the benefit of Amtrak" on or anywhere near that dot.  (Amtrak Dep. at 268:19-269:6.)  Under the plain language of the statute and the binding precedent of *City of New York*, such an unlimited, fact-insensitive approach to section 24902(j) preemption cannot stand.

<p style="text-align:center">*     *     *     *</p>

In sum, as this Court has noted, the law is clear that "[e]ven where the text of a preemption clause is susceptible of more than one plausible reading, absent a conflict, courts should 'accept the reading that disfavors pre-emption.'"  *Smokeless Tobacco*, 703 F. Supp. 2d at 336.  Here, where Amtrak cannot support its position at all under either the facts or the law, the analysis is even simpler:  Amtrak's 30(b)(6) admissions should be accepted.  The same broad interpretation of sections 23401(g) and 24902(j) rejected in *City of New York* should be rejected

<p style="text-align:center">37</p>

by this Court as well. And summary judgment dismissing both of Amtrak's claims for express

preemption on the merits should be granted to the Commissioner.

### C.    Amtrak's Implied Preemption Claims Under the RPSA and the Rail Act Also Fail As a Matter of Law

Relying on a "purposes and objectives" theory, Amtrak also brings claims under both the

RPSA and the Rail Act for implied preemption. (Cplt. ¶¶ 6, 54-57, 64-65.)  But, as we discuss

below, they fare no better than its express preemption claims.[13]  Summary judgment dismissing

Counts I and III in their entirety is thus fully warranted.

As the Supreme Court has made clear, Amtrak must meet a "high threshold" on its

implied preemption claims.  *Chamber of Commerce of U.S.* v. *Whiting*, 131 S. Ct. 1968, 1985

(2011) (plurality opinion); *see also Madeira* v. *Affordable Hous. Found.*, 469 F.3d 219, 238 (2d

Cir. 2006) ("The conflict standard for preemption is strict.").  It has to establish that the

Commissioner's exercise of her state eminent domain powers to take the seven parcels of land at

issue "stands an obstacle to the accomplishment and execution of the full purposes and

objectives" of the RPSA and the Rail Act.  *Arizona*, 132 S. Ct. at 2501; *see Smokeless Tobacco*,

703 F. Supp. 2d at 334.  This "requires clear evidence of congressional intent and 'a sharp

conflict between state law and federal policy.'"  *In re Methyl Tertiary Butyl Ether Prods. Lia.*

*Litig.*, 739 F. Supp. 2d 576, 595 (S.D.N.Y. 2010) (quoting *Marsh* v. *Rosenbloom*, 499 F.3d 165,

179) (2d Cir. 2007)); *see also Marsh*, 499 F.3d at 177-80.  Amtrak does not come close to

meeting that standard here.

To be clear, the purposes, mission, and goals of the RPSA and the Rail Act are not in

dispute.  It is evident that these statutes were enacted "to provide a rail service system in the

---

[13] Indeed, where, as here, the relevant federal statutes contain express preemption clauses but those clauses do not apply to the state action at issue, "[t]he case for federal pre-emption is particularly weak."  *Wyeth*, 555 U.S. at 574-75 (quoting *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989)) (internal quotation marks omitted).

midwest and northeast regions of the United States which is adequate to meet the needs and service requirements of these regions and of the national rail transportation system," *In re Litig. Under Reg'l Rail Reorganization Act of 1973*, 373 F. Supp. 1401, 1402 (J.P.M.L. 1974) (citing 45 U.S.C. § 701), "to provide efficient and effective intercity passenger rail mobility consisting of high quality service that is trip-time competitive with other intercity travel options and that is consistent with the goals" of "maximiz[ing] [Amtrak's] revenues and minimiz[ing] Government subsidies," 49 U.S.C. § 24101 -- and, in short, to create and maintain "a modern, efficient intercity railroad passenger service system," *City of Philadelphia* v. *Baker*, 508 F.2d 279, 282 (3d Cir. 1975).  Under the fact-specific analysis required, however, Amtrak's assertion that the Commissioner's condemnation of its property interferes with these congressional purposes and objectives, let alone creates the sort of "sharp conflict" necessary for implied preemption, is utterly devoid of the necessary proof.

The testimony of Amtrak's 30(b)(6) witness, Earl Watson, demonstrates, once again, the futility of its claims here.  At his deposition, Mr. Watson admitted that, contrary to the assertions in the Amended Complaint, the Commissioner's acquisitions of Parcels 105, 107, 108, 109, 110, and 111 in February 2008 have not interfered in any way with the purposes and objectives of the RPSA and the Rail Act.  As he stated, these acquisitions "haven't impacted [Amtrak's] ability to operate a railroad," "haven't stopped Amtrak from performing any projects," "ha[ve]n't interfered with Amtrak's ability to provide efficient and effective intercity rail service," and haven't "interfered with Amtrak's ability to provide the safety and maintain the integrity of its rail line."  (Amtrak Dep. at  159:6-22, 162:19-163:4.)

And, with respect to any potential future impact from the Commissioner's acquisitions, Mr. Watson conceded that "the only way" that the taking of these parcels "would interfere with

Amtrak's interests is if construction work were done" on the parcels "and if that construction work showed some sort of environmental problems and if those environmental problems led to financial liability." (Amtrak Dep. at 214:5-215:13.) But the mere risk of increased financial liability for Amtrak, particularly such an attenuated one as this, is not enough for a viable preemption claim. Federal law, in fact, assumes that Amtrak will be subject to "tort claims imposing costs on the company," *Haynes*, 423 F. Supp. 2d at 1081; *see also supra* pp. 33-35 -- though under Amtrak's flawed reasoning such claims would necessarily be preempted, as they, too, add to Amtrak's "potential financial liability" and thus, by Amtrak's logic, would "interfere with Amtrak's interests" as set forth in the RPSA and the Rail Act. (Amtrak Dep. at 214:5-215:13, 260:6-262:3.)

Moreover, Amtrak has produced no evidence linking the Commissioner's property takings themselves to this purported financial risk. To the contrary, Mr. Watson conceded that this risk arises only from the DOT's proposed use of the parcels *after* their acquisition. (Amtrak Dep. at 163:12-15 ("Q. The interference itself is caused by the construction activity, right? A. Construction activity, yes."); *id.* at 252:11-253:7; *id.* at 262:16-18 ("Q. So it's only the digging that creates any issues? A. Correct."); *id.* at 265:24-266:3.)

This distinction -- *i.e.*, between the taking of property by eminent domain and its ultimate use by the State -- may be seen as insignificant by Amtrak. (Amtrak Dep. at 265:15-23.) But it is a meaningful one under New York law. *See, e.g.*, *Vitucci* v. *N.Y.C. Sch. Constr. Auth.*, 289 A.D.2d 479, 480 (2d Dep't 2001) ("[T]here appears to be little limitation on the condemnor's right to put the property to an alternate use upon the discontinuation of the original planned public purpose."). Indeed, even in the cases Amtrak relies on in support of its preemption claims (which we discuss in more detail and distinguish on multiple grounds below, *see supra* pp. 47-

49), the courts there were careful to find interference caused by the condemnations of Amtrak property, not by the condemnees' subsequent use of that property. *See United Ctr. Dev. Corp.* v. *Nat'l R.R. Passenger Corp.*, 103 F.3d 62, 65 (8th Cir. 1997); *UGI Utils.* v. *Nat'l R.R. Passenger Corp.*, No. 1:CV-02-1230, 2004 WL 3928263, at *2, 4-5 (M.D. Pa. July 2, 2004); *Nat'l R.R. Passenger Corp.* v. *Colonial Pipeline Co.*, No. Civ. JFM-05-2267, 2006 WL 236788, at *4 (D. Md. Jan. 31, 2006). Here, by Amtrak's own admissions, such interference simply does not exist.

It should be noted that Amtrak's inability to identify any real interference caused by the Commissioner's acquisitions is of no surprise. As detailed above, *supra* pp. 5-8, the parcels at issue consist of: (i) a 5,000 square-foot parcel of land, acquired by the State in fee, that had not been used at all by Amtrak in years, and had actually long been fenced in by the adjacent property owner and used as part of its land (Parcel 105); (ii) several small easements alongside Amtrak's tracks that DOT acquired in order to construct and maintain a new retaining wall, in the very same spot as the old, existing wall (Parcels 107, 108, 109, 110, and 111); and (iii) an (as of yet not acquired) aerial easement over Amtrak's tracks at E. 172nd Street in the Bronx, in order to rebuild a bridge that had existed at that location for many years, and which arguably the City of New York had retained the right to rebuild in any event (Parcel 178). And, by offering to sell each of these six parcels to DOT for the very same amounts, *supra* pp.13-14, Amtrak has also admitted that it has no actual need for the parcels already acquired here and no issues with the just compensation awards.

In the end, with no specific burdens or obstacles to point to, Amtrak is left to argue for a *per se* rule: "that there is no parcel of Amtrak property anywhere in the United States that a state could ever take by eminent domain." (Amtrak Dep. at 268:14-18.) Such a fact-insensitive

approach, however, is irreconcilable with the sort of "fact-specific inquiry" required in preemption cases. *Buffalo S. R.R.*, 434 F. Supp. 2d at 249.

This Court's decision in *Buffalo Southern Railroad* is instructive. There, the Court was also confronted with a railroad's challenge on preemption grounds to the use of state eminent domain law to acquire rail property. 434 F. Supp. 2d at 243-44. In addressing that challenge, the Court, although examining a different federal statute, asked a very similar question to that posed by the implied preemption analysis in this case under the RPSA and the Rail Act -- *i.e.*, whether a local government's taking of railroad property by eminent domain "would 'prevent or unreasonably interfere with railroad operations.'" *Id.* at 248. This Court determined there that it would, and that preemption was therefore warranted. *Id.* at 249. But that was only because "[t]he Village [wa]s threatening to acquire the entire parcel of land" -- a ten-acre tract including a "1600-foot spur of track, the offloading facility [for rail cars], storage facilities, roads, and parking" -- "in fee simple." *Id.* at 248-49. The Court made clear that had the facts been different, and had, for example, the Village only been "looking for an easement over some small area," its decision on the preemption question likely would have been different as well. *Id.* at 249.

Here, where the property acquisitions at issue are minimal and Amtrak has shown no interference with its railroad operations -- or, indeed, with any purposes or objectives of the RPSA and the Rail Act -- preemption is without basis. Accordingly, summary judgment dismissing Amtrak's implied preemption claims should be granted to the Commissioner.

**D.    Amtrak Has No Viable Claim for Preemption Based on the Federal Government's Mortgage Interest in Its Property -- and the Mortgage Documents, In Fact, Strongly Support the Commissioner's Exercise of Eminent Domain Here**

In Count II of the Amended Complaint, Amtrak raises yet another purported basis for preemption of the Commissioner's takings: "the United States' Mortgage Interest in Amtrak's Property." (FAC at 12.) Amtrak's contention is that the federal government has a mortgage interest in each of parcels at issue here that "cannot be dislodged by operation of state law," and that the Commissioner's exercise of "her inferior power of eminent domain" with respect to these parcels is therefore preempted by the federal government's mortgage interest, the statute that authorized the creation of that interest, and the Supremacy Clause. (FAC ¶¶ 59-60.) Like the rest of Amtrak's claims, Count II has no merit.

The mortgage agreement itself belies Amtrak's argument. The Commissioner does not dispute, at least for the purposes of this motion, that the federal government's mortgage is applicable to the property in dispute (Parcels 105, 107, 108, 109, 110, and 111). But the terms of mortgage make clear that, by securing an interest in Amtrak's real property, the federal government was not intending to preclude states from acquiring that same property by eminent domain. (Ex. 41 § 1.07, at 6.) Indeed, the mortgage expressly contemplates that such takings will occur, and has a provision specifically setting forth, in detail, how amounts received in just compensation are to be allocated between the federal government and Amtrak when Amtrak property is taken pursuant to state eminent domain law, and for what purposes such proceeds are to be used. (*Id.*)

The relevant provision, section 1.07 of the mortgage agreement, states as follows:

> Condemnation Proceedings and Proceeds. The Mortgagor [*i.e.*, ***Amtrak] shall be entitled to all compensation***, awards, damages, claims, rights of action and proceeds (collectively hereinafter referred to as the "Condemnation Proceeds") ***of, or on account of,***

43

> ***any*** damage or ***taking of the Mortgaged Property or any part
> thereof through condemnation***, and the Mortgagee [*i.e.*, ***the
> United States] is hereby authorized at its option, to commence,
> appear in and prosecute in its own or [Amtrak's] name any
> action or proceeding relating to any condemnation and*** with
> [Amtrak's] consent, which shall not be unreasonably withheld or
> delayed, ***to settle or compromise any claim in connection
> therewith***; provided, however, that after deducting the costs and
> expenses (including reasonable attorneys' fees) of [Amtrak] and
> [the United States] in collecting or adjusting the Condemnation
> Proceeds, ***the remaining net Condemnation Proceeds shall be
> applied by [Amtrak] to*** the cost of reconstruction, repair,
> replacement, or restoration of or improvement or supplement to
> ***any part of the Mortgaged Property*** provided that any such
> reconstruction, repair, replacement, restoration, improvement or
> supplement ***shall be subject to the lien of this Mortgage as a lien
> thereon to the same extent as the portion of the Mortgaged
> Property so*** damaged or ***condemned*** and shall thereafter be
> deemed Mortgaged Property for all purposes under this Mortgage.
> ***A taking or condemnation shall not affect [Amtrak's] obligations
> under this Mortgage, except as herein expressly provided.***

(*Id.* (emphases added).)  By its plain terms, this provision establishes that both Amtrak and the

federal government understood that Amtrak's property, including the parcels at issue in this case,

is subject to condemnation -- and that the federal government's mortgage interest did nothing to

preclude or otherwise affect existing state power to take such property by eminent domain.  (*Id.*)

Indeed, instead of barring such takings because, as Amtrak argues in its pleading, they

would somehow "dislodge[]" the federal government's mortgage interest, the mortgage

agreement sets forth specific protections for the federal government when acquisitions of the

mortgaged Amtrak property by eminent domain occurred.  The mortgage agreement provides,

for example, that Amtrak must use any just compensation proceeds (after Amtrak's and the

United States's "costs and expenses . . . in collecting and adjusting" this just compensation are

"deduct[ed]") for the "reconstruction, repair, replacement, restoration, improvement or

supplement" of its mortgaged property, and that the federal government shall have a lien over

this reconstructed, repaired, replaced, restored, improved, or supplemented property "to the same

44

extent" that it did over the property "so . . . condemned." (*Id.*) And the mortgage makes clear that the federal government's right to be made whole here is not impacted by state takings of Amtrak property; to the contrary, the agreement expressly states that, with respect to the mortgage, "[a] taking or condemnation shall not affect [Amtrak's] obligations" to federal government. (*Id.*)

Amtrak may argue, as it has in other cases, that section 1.07 applies exclusively to takings by the federal government, and that these federal takings are the only ones contemplated by the terms of the mortgage. But, to be blunt, that makes no sense. Why, for example, would the mortgage "authorize[]" the federal government "to commence, appear in and prosecute" an action, in either "its own or [Amtrak's] name," relating to a condemnation of Amtrak property that the federal government itself had made? (*Id.*; *see* Ex. 44 at 1 (noting that "an entity *within* the federal government cannot claim a taking by the very same government").) And why would it allow the federal government "to settle or compromise" on behalf of Amtrak "any claim in connection" with the federal government's own takings of Amtrak property? Contrary to Amtrak's arguments, section 1.07 should be read exactly as it written -- as applying to and recognizing the validity of "any . . . taking of the Mortgaged Property or any part thereof through condemnation," including the Commissioner's takings at issue in this case. (Ex. 41 § 1.07, at 6.)

Far from providing a basis for Amtrak's claim here, the mortgage actually stands as strong support for the Commissioner's takings -- and further persuasive evidence that none of Amtrak's preemption claims in this action any merit. As the Supreme Court held in *Wyeth* v. *Levine*, federal agencies "have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an

'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" 555 U.S. at 557.

That is precisely what happened here.  In the mortgage, "the Secretary of Transportation, acting through the Federal Railroad Administrator," as part of his "implementation of a Federal program" established by the Rail Act and the RPSA, determined, in section 1.07, that the application of state eminent domain law to take Amtrak's property was fully consistent with the federal law creating and governing Amtrak.  (Ex. 41 at 1; *id.* § 1.07, at 6; *id.* § 4.06, at 20.) Under *Wyeth*, and the longstanding rule of *Skidmore* v. *Swift & Co.*, 323 U.S. 134 (1944), at least "some weight" should be given to this determination.  *Wyeth*, 555 U.S. at 556-57; *see also, e.g.*, *Farina* v. *Nokia Inc.*, 625 F.3d 97, 126-27 & n.27 (3d Cir. 2010) (deferring, under *Wyeth* and *Skidmore*, to a federal agency's informal views on preemption and the impact of the state law at issue on the federal regulatory scheme).

For all these reasons, Amtrak's claims for preemption in this case, both those in Count II based on the federal government's mortgage interest in Amtrak's property as well as those in the rest of the Amended Complaint, fail as a matter of law and should be dismissed on summary judgment. [14]

---

[14] In *National Railroad Passenger Corp.* v. *Colonial Pipeline Co.*, No. Civ. JFM-05-2267, 2006 WL 236788 (D. Md. Jan. 31, 2006), the district court rejected the argument that section 1.07 "itself permit[s] state condemnation of Amtrak properties." *Id.* at *3 n.3.  But that is not the Commissioner's argument here.  The point is not that the mortgage grants condemnation authority to the states, which is what the *Colonial Pipeline* court was deciding, but that the mortgage itself does not provide a basis for Amtrak's preemption claims, and that, given their "unique understanding of the statutes they administer," some deference should be given to the Secretary of Transportation's and the Federal Railroad Administrator's determination and explanation of the relevant "state law's impact on the federal scheme." *Wyeth*, 555 U.S. at 556-57.  On these grounds, as well as the others discussed, Amtrak's preemption claims are without basis here.

**E.    The Out-of-Circuit Cases Relied on by Amtrak Do Not Support Its Claims**

In arguing for preemption in this case, Amtrak has relied heavily on three federal court decisions from outside the Second Circuit: *United Center Development Corp.* v. *National Railroad Passenger Corp.*, 103 F.3d 62 (8th Cir. 1997); *UGI Utilities* v. *National Railroad Passenger Corp.*, No. 1:CV-02-1230, 2004 WL 3928263 (M.D. Pa. July 2, 2004); and *National Railroad Passenger Corp.* v. *Colonial Pipeline Co.*, No. Civ. JFM-05-2267, 2006 WL 236788 (D. Md. Jan. 31, 2006).[15]  But not only are *United Center*, *UGI*, and *Colonial Pipeline* non-binding on this Court, they are -- particularly given the "fact-specific inquiry" required on any preemption analysis, *Buffalo S. R.R.*, 434 F. Supp. 2d at 249 -- plainly distinguishable.

*First*, none of these cases accepted Amtrak's arguments for express preemption based on 49 U.S.C. § 24301(g) or 49 U.S.C. § 24902(j).  Nor did they accept its argument for preemption based on the federal government's mortgage interest in Amtrak's property.  *See, e.g.*, *Colonial Pipeline*, 2006 WL 236788, at *1 n.2 (construing this mortgage argument as no different from Amtrak's implied preemption claims under the RPSA and the Rail Act).  Thus, as to these claims, *United Center, UGI*, and *Colonial Pipeline* offer no support whatsoever for Amtrak.

*Second*, it is notable that in each of *United Center*, *UGI*, and *Colonial Pipeline*, the condemning authority was not the state itself, but a private or quasi-public company that had been delegated limited eminent domain powers under state law.  *See United Center*, 103 F.3d at 63 (condemnor was "a redevelopment corporation organized under Missouri law"); *UGI*, 2004 WL 3928263, at *1 (condemnor was "a Pennsylvania public utility corporation"); *Colonial*

---

[15] Both Amtrak and its counsel have pointed to these cases in their discussions with DOT and the State Attorney General's Office.  And, indeed, Amtrak has produced numerous copies of these cases, and its briefs in them, in its document production to the Commissioner.

*Pipeline*, 2006 WL 236788, at *1 (condemnor was a company that "operates pipelines along the East Coast that carry oil from Texas north to New Jersey").

Here, by contrast, the condemnor is the State of New York itself, acting through the Commissioner, and exercising "a 'necessary attribute of sovereignty'" in an "area[] of law traditionally reserved to the states." *W. 41st St. Realty*, 298 A.D.2d at 5; *Export-Import Bank*, 609 F.3d at 117. Under these very different circumstances, the "presumption against pre-emption," *e.g.*, *Wyeth*, 555 U.S. at 565 n.3, which is not discussed at all in *United Center*, *UGI*, and *Colonial Pipeline*, strongly favors the Court finding for the Commissioner. *See* cases cited *supra* pp. 28-30.[16]

*Third*, the alleged interference with Amtrak's interests in *United Center*, *UGI*, and *Colonial Pipeline* is simply not of the same sort as the purported interference here. As already noted, in those cases, unlike this one, Amtrak argued that interference occurred from the taking itself, not from the proposed subsequent use of the acquired Amtrak property. And, moreover, Amtrak has made clear here that it has no actual need for the parcels at issue in order to fulfill its statutory mission "to provide efficient and effective intercity passenger rail . . . service," 49 U.S.C. § 24101, and that it has no issue with the just compensation the State has offered for these parcels. To the contrary, as discussed above, Amtrak has offered to sell this property to DOT, at the very same amounts that DOT has offered in just compensation. *See supra* pp. 13-14. Thus, the concerns expressed in *United Center*, *UGI*, and *Colonial Pipeline* that the takings would "overrid[e] Amtrak's decision that [the] property is 'required for inter-city rail passenger service,'" *UGI*, 2004 WL 3928263, at *5 (quoting *United Ctr.*, 103 F.3d at 65), or Amtrak's

---

[16] Nor did these cases consider any of Eleventh Amendment, waiver, statute of limitations, or abstention arguments that, as noted above, are dispositive here.

48

judgment as to "what constitutes 'fair and reasonable compensation'" for its property, *Colonial Pipeline*, 2006 WL 236788, at *4, are just not present in this case.[17]

Finally, to the extent the Court finds that *United Center*, *UGI*, and *Colonial Pipeline* are not distinguishable here, it should not follow them. As the Supreme Court has held, "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives.'" *Whiting*, 131 S. Ct. at 1985. Amtrak must satisfy a "high threshold" to prevail on its claims. *Id.* For all the reasons discussed, it cannot do so here.

---

[17] The *UGI* court's assertion that "no court has ever allowed a state agency to condemn the real property or facilities of Amtrak," *UGI*, 2004 WL 3928293, at *5, is, whether accurate or not, also of no moment here. As is true of all takings undertaken by the State itself, the Commissioner does not need "court authorization" to take Amtrak property. EDPL § 402(A); *see Knight*, 443 F.2d at 416.

## CONCLUSION

For the foregoing reasons, the Commissioner respectfully requests that the Court grant

her motion, and dismiss all claims in Amtrak's Amended Complaint with prejudice.

Dated: New York, New York
       August 31, 2012

<div style="margin-left: 40%;">

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
*Attorney for Defendant*
By:
/s/ *William J. Taylor, Jr.*
William J. Taylor, Jr.
Assistant Attorney General
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-8426
william.taylor@ag.ny.gov

</div>

Reproduced on Recycled Paper

50